OPINION OF THE COURT
Elliott Wilk, J.
Plaintiff brought this action against defendants Penthouse *153 International, Ltd. and Robert Guccione to recover damages for fraud, misrepresentation, unjust enrichment, quantum meruit, breach of contract, prima facie tort, intentional infliction of emotional harm and sexual harassment. Plaintiff also seeks an accounting.
Penthouse International, Ltd. is the publisher of Penthouse Magazine. Guccione is the founder, chairman and principal shareholder of Penthouse International, Ltd.
Plaintiff, Marjorie Thoreson, worked for Penthouse under the name Anneka diLorenzo from 1973 until 1980. She grew up in St. Paul, Minnesota. When she was 12 or 13 her parents were involved in a bitter divorce. When she was 15, plaintiff traveled to Los Angeles to seek her fortune. While in California, she had some minor brushes with the law. She found work as a cocktail waitress, a topless dancer, and a receptionist. She also studied acting and entered beauty contests. She did some work as a model and as an actress.
In 1973, she was impressed by a television interview of Guccione and sent some test photos to Penthouse. Guccione met with her in Los Angeles, after which he agreed to make her Penthouse Pet of the Month for September. Plaintiff was flown to New York and then to London, where she was photographed by Guccione. While in London, they became intimate. She was 20 years old.
Plaintiff told defendant that she aspired to a career as an actress. Defendant assured her that he would use his contacts to assist her. After about one week in London, they returned to New York. In June 1973, plaintiff returned to Los Angeles. While in the taxi to the airport, plaintiff signed a management agreement with Penthouse.
It appears that the agreement was unique in the world of "Pets”. The agreement generally provided that Penthouse would guide Thoreson in her career in the entertainment field. The contract noted plaintiff’s inexperience and unfamiliarity with the entertainment area and her need for "supervised guidance and specialized training to develop her talents”. Penthouse agreed to act as Thoreson’s personal representative, general advisor and to use its best efforts to supervise, guide and direct her career. Penthouse was to assist plaintiff in the selection of suitable roles and projects in furtherance of her career in public entertainment. In exchange, plaintiff granted defendants exclusive control over her career and exclusive rights to commissions. In addition, plain *154 tiff executed a power of attorney to allow Penthouse to handle her finances and to receive payments on her behalf.
Plaintiff was soon contacted by defendant with an offer to appear in Viva, a magazine published by Guccione. She appeared on the cover of the December issue.
Plaintiff also accepted an opportunity to do a fall 1973 promotion tour for Penthouse and Viva. She returned to Los Angeles after the tour.
In 1974, she took acting classes, paid for by Penthouse, and made several promotional appearances for Penthouse. She also urged Guccione to hasten her acting career. Guccione agreed to.make her Pet of the Year for 1975 and invited her to live with him in New York. In the spring of 1975, she moved into Guccione’s house, where she was given a small room of her own. She did a Penthouse promotional tour after the 1975 Pet of the Year issue, which was followed by an international tour for the United States Department of Defense.
As Pet of the Year, plaintiff was to receive prizes valued at $50,000. She claims that the value of what she received was considerably less than that.
After the Defense Department tour, plaintiff returned to Guccione’s New York house. In 1976, she began to hear about the movie Caligula, which was being produced by Penthouse. Plaintiff claims that defendant led her to believe that she might play Caligula’s wife. To prepare herself for the role, at Guccione’s urging, she had surgery to enlarge her breasts.
While plaintiff was recuperating from the surgery, defendant told her that Caligula’s director had hired another actress to play Caligula’s wife. He promised to find plaintiff another role in the film.
In the spring of 1976, plaintiff flew to Rome, where Caligula was being filmed. She made a minor appearance and returned to New York. The shooting of the movie was completed by Christmas 1976. Guccione correctly predicted that the film, which had experienced a series of defections, would be a commercial and critical disaster. In an effort to rescue the commercial end, he incorporated two new scenes into the movie.
Guccione returned to the set in January 1977, with plaintiff and other Penthouse pets to shoot the scenes. One scene graphically captured plaintiff performing oral sex on a man. The second showed plaintiff and Penthouse Pet Lori Wagner *155 having sex with each other. Plaintiff claims to have performed in the scenes reluctantly and only after having been persuaded that it would further her career.
Plaintiff returned to Rome in the spring of 1977 to do the movie Messalina, in which she had the starring role. She was recruited for the part by Frederico Rosselini, who met plaintiff on the set of Caligula. She did four weeks of promotional work for the film in Italy, after which she went to Florida.
Plaintiff returned to New York in 1978 and, following a lead that she received in Rome, spoke to Mr. Polenco of the William Morris Agency about working as her agent. She auditioned for the lead in Raging Bull but did not get the part. The agency never contacted her again.
In 1978, Guccione told plaintiff that he was upset because his London based financial advisor was not spending enough time in the United States. He told plaintiff to seduce the advisor and to encourage him to move to this country. Plaintiff refused. Defendant insisted that plaintiff do so because it was important to him and to the Penthouse empire. Plaintiff capitulated. Her sexual affair with the financial advisor, carried on during his periodic trips to New York, and guided by Guccione, lasted 18 months.
In the summer of 1980, defendant encountered difficulty in raising money to open a gambling casino in Atlantic City. Defendant asked plaintiff to sleep with a furniture manufacturer from Milan, who, defendant believed, could assist him with this venture. Plaintiff refused. Defendant told her that she had to do it because she owed him. She did.
Caligula was released in 1980. Promotions were done by plaintiff and Guccione. Defendant told plaintiff that he wanted her to promote Caligula in Japan. Plaintiff refused because her experience on the United States promotional tour had been degrading and humiliating. Defendant refused to discuss plaintiff’s reluctance to go. Plaintiff did not go, as a consequence of which she was fired. She never did another film.
With the exception of sexual harassment, I am not persuaded that plaintiff should prevail on any of her causes of action. I believe that defendants tried to promote plaintiff’s career as a performer. It is not clear that defendants beckoned plaintiff down an unwanted path or that her acting talent was intentionally subordinated to any of her other attributes. In addition, plaintiff has failed to prove that she was wrongfully denied any of the prizes to which she was entitled by virtue of her selection as Pet of the Year.
*156 I do, however, find in plaintiffs favor on her sexual harassment claim.
The New York State Human Rights Law provides that any person "aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages” (Executive Law § 297 [9]; see, Murphy v American Home Prods. Corp., 58 NY2d 293, 307 [1983]). Actions of an employer which discriminate against an individual in the "terms, conditions or privileges of employment” because of that person’s sex are encompassed within the ambit of actionable wrongs under this section. (See, Executive Law § 296 [1] [a]; § 292 [4].) This provision, like other civil rights statutes containing similar language, has been interpreted to prohibit acts of sexual harassment in the workplace. (See, the incisive analysis of Justice Kristin Booth Glen in Rudow v New York City Commn. on Human Rights, 123 Misc 2d 709 [Sup Ct, NY County 1984], affd 109 AD2d 1111 [1st Dept 1985], lv denied 66 NY2d 605 [1985]; see, e.g., Matter of Salvatore v New York State Div. of Human Rights, 118 AD2d 715 [2d Dept 1986]; Matter of State Univ. v State Human Rights Appeal Bd., 81 AD2d 688 [3d Dept 1981], affd 55 NY2d 896 [1982].) Plaintiffs cause of action based on her claim of sexual harassment is, therefore, cognizable under Executive Law § 297 (9).
Under the Human Rights Law (HRL), an employer is prohibited from exploiting a dominant position of power in the workplace by imposing sexual demands upon an employee as an implicit condition of continued employment. Any attempt by an employer to use the terms, conditions or privileges of employment to coerce an employee, targeted on the basis of gender, to agree to participate in sexual activity is a form of sex discrimination outlawed by State law. Proof of such discriminatory conduct on the part of an employer suffices to trigger liability under the Executive Law. (See, Cullen v Nassau County Civ. Serv. Commn., 53 NY2d 492, 496-497 [1981].) The employee need not prove that he or she resisted the abuse or refused to comply with the sexual demands (see, e.g., Meritor Sav. Bank v Vinson, 477 US 57 [1986]; Rudow v New York City Commn. on Human Rights, 123 Misc 2d, supra, at 718, quoting Bundy v Jackson, 641 F2d 934, 945 [DC Cir 1981]); that tangible job benefits were lost (supra; cf., Matter of Crookston v Brown, 140 AD2d 868 [3d Dept 1988]); or that the discriminatory conduct was intentional. (See, Cullen v Nassau County Civ. Serv. Commn., supra.) Those issues, relating to the *157 harm suffered by the employee and the relative offensiveness of the employer’s actions, are factors in determining the appropriate remedy. (Supra; see also, Batavia Lodge v New York State Div. of Human Rights, 35 NY2d 143 [1974].)
The credible evidence reveals that defendant Guccione utilized his employment relationship with plaintiff to coerce her to participate in sexual activity with the furniture manufacturer and with his financial advisor in order to advance his business. He compelled plaintiff to continue the relationship with his advisor, which he helped to choreograph, for a period of 18 months.
Plaintiff’s testimony concerning these matters was controverted only by defendant Guccione’s blanket denial that the events took place. I do not believe him.
Because plaintiff capitulated to the demands of her employer, she was not discharged. Proof of compensatory damages was comprised of her testimony about the emotional impact of these experiences. The statute authorizes the awarding of compensatory damages for plaintiff’s subjective mental suffering, on her testimony alone. (See, Cullen v Nassau County Civ. Serv. Commn., 53 NY2d, supra, at 497; Batavia Lodge v New York State Div. of Human Rights, 35 NY2d, supra, at 146-147.) As compensatory damages, plaintiff is awarded $60,000.
In addition to compensatory damages, which are designed exclusively to redress actual injury, plaintiff requests punitive damages.
Although punitive damages may not be available under the HRL to a party who seeks redress before the Human Rights Division, as Justice Harold Baer observed in his well-reasoned decision in Seitzman v Hudson Riv. Assocs. (143 Mise 2d 1068 [Sup Ct, NY County 1989]), they may be imposed in a judicial proceeding. (Compare, Executive Law § 297 [4] [c] [sanctioning an award of "compensatory damages” by the State Division], with Executive Law § 297 [9] [authorizing an action in court "for damages and such other remedies as may be appropriate”]; see, Murphy v American Home Prods. Corp., 136 AD2d 229 [1st Dept 1988].)
An award of exemplary damages is traditionally available under the common law where " 'the plaintiff proves sufficiently serious misconduct on the defendant’s part’ ” (Smith v Wade, 461 US 30, 52 [1983], quoting Dobbs, Law of Remedies 204 [1973]). It represents an appropriate response to "conduct *158 having a high degree of moral culpability (see, Walker v Sheldon, 10 NY2d 401, 405) which manifests a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.’ (Welch v Mr. Christmas, 57 NY2d 143, 150.)” (Home Ins. Co. v American Home Prods. Corp., 75 NY2d 196, 203-204 [1990].) The function or purpose of punitive damages is to "act as a deterrent to the offender 'and to serve as a warning to others. They are intended as punishment for gross misbehavior for the good of the public and have been referred to as "a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine.” * * * Punitive damages are allowed on the ground of public policy * * *. The damages may be considered expressive of the community attitude towards one who willfully and wantonly causes hurt or injury to another’ ” (supra, at 203).
In consideration of these public-oriented goals, "[p]unitive damages generally are reserved for * * * aggravated circumstances which effect a public interest”. (Laurie Marie M. v Jeffrey T. M., 159 AD2d 52, 58 [2d Dept 1990].) One category of misconduct which implicates the public interest, in which punitive damages are often upheld, is "[w]here persons in positions of power or authority wantonly misuse their authority” or betray a "relationship involving a public trust”. (Supra, at 59.) This is particularly true where sexual abuse is involved. (Supra; see, Micari v Mann, 126 Misc 2d 422 [Sup Ct, NY County 1984].) Such misconduct, by its nature, "causes incalculable injury to society as well as private interests” (Laurie Marie M. v Jeffrey T. M., 159 AD2d, supra, at 60).
An award of punitive damages under Executive Law § 297 (9) is a particularly appropriate response to flagrant acts of discrimination. The HRL extends to the workplace basic notions of equality and human dignity emanating from the Constitution. Indeed, "[i]n enacting the Human Rights Law, our State Legislature, in a preamble, minced no words in declaring that the discriminatory practices it was interdicting violated the fundamental principles underlying a free society and threatened the peace and tranquility of the State (Executive Law, § 290; see City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 423-424).” (Cullen v Nassau County Civ. Serv. Commn., 53 NY2d 492, 495-496 [1981], supra.) An employer’s prejudicial abuse of his authority to coerce sexual compliance on the part of an employee is an egregious violation of equality principles and of a relationship in which the public has, by virtue of the HRL, demonstrated a strong *159 interest. Plaintiffs legal action, by its nature, serves the dual purpose of enabling her to vindicate her individual rights and to promote " 'the good of the public’ ” by advancing society’s interest in enforcing statutory proscriptions against discrimination. (Home Ins. Co. v American Home Prods. Corp., 75 NY2d, supra, at 203.)
The evidence demonstrates that defendant Guccione’s acts of discrimination were "intentionally committed” (Batavia Lodge v New York State Div. of Human Rights, 35 NY2d, supra, at 147), and "willfully directed at [a] specific individual”. (Cullen v Nassau County Civ. Serv. Commn., 53 NY2d, supra, at 497.) The cold and calculating use of his authority as plaintiff’s employer, in precisely the manner deemed by the Legislature to be harmful to society, affects a public trust. Because that abuse of power within a protected relationship entailed sexual coercion, it is precisely the sort of extreme misconduct that would justify the imposition of punitive damages even under traditional common-law principles.[1] (Cf., Penal Law §§ 135.60, 230.30 [1].)
Protection for the societal interests implicated by defendant’s conduct is suggested not only by the traditional punitive damages doctrine, but by the HRL itself. The statute has long been interpreted, primarily in the context of adjudications by the State Division of Human Rights, to require consideration of these public-oriented principles in determining the appropriate remedy for acts of employment discrimination.
The HRL confers upon the State Division of Human Rights "broadly stated policy-laden discretion” in providing an appropriate remedy for acts of discrimination, in order to effectively "combat the pernicious effects of the outlawed evils”. (Cullen v Nassau County Civ. Serv. Commn., 53 NY2d, supra, at 496.) In recognition of the public, as well as private, nature of the wrong committed in acts of employment discrimination, a *160 flexible statutory standard governs the fashioning of a. remedy, to ensure that societal, as well as individual, interests are effectively served.
"[RJecovery [under the Human Rights Law] should not be based solely on common-law strictures as would be applied in determining liability for a tort. Recovery here, instead, is based on a statute which effectuates a State policy against discrimination. * * *
"The extremely strong statutory policy of eliminating discrimination gives the Commissioner of Human Rights more discretion in effecting an appropriate remedy than he would have under strict common-law principles * * * the right is statutory and involves vindication of a public policy as well as vindication of a particular individual’s rights.” (Batavia Lodge v New York State Div. of Human Rights, 35 NY2d, supra, at 145-146.)
The statutory expansion of the remedial powers usually available enables the State Division, in awarding compensatory damages, to hold an employer liable for the mental distress shown to have been suffered by the plaintiff as a result of the act of discrimination.[2] Neither actual intent to cause emotional distress, nor intent to discriminate, need be proved. The statute charges the guilty employer with the duty to foresee the mental and emotional consequences that could flow from his or her conduct.
Courts use the same broad standard in actions brought under Executive Law § 297 (9) to determine the appropriate relief. (Cf, Koerner v State of New York, 62 NY2d 442, 448-449 [1984].) The "important public policy to be served in” cases brought under the HRL (Palmer v New York State Human *161 Rights Appeal Bd., 47 NY2d 734, 735 [1979]) is a most appropriate yardstick by which punitive damages may be measured. Such an award provides concrete expression to the statutorily communicated attitude of the community that employees are absolutely protected from the insult, indignity and economic consequences, if any, attendant to discrimination. It also effectuates the strong statutory policy of eliminating and preventing discrimination.
Given the public policy aims of the HRL, which mirror the dual functions served by punitive damages — retribution and deterrence — plaintiff is entitled to punitive damages to the extent calculated to reflect the community’s outrage and moral indignation, and to protect "the public good” by attempting, through deterrence, to eradicate such conduct. (See, Home Ins. Co. v American Home Prods. Corp., supra; Micari v Mann, 126 Misc 2d, supra, at 425.)
In order to fix punitive damages, we must, in light of these principles, assess the nature of defendants’ conduct, the harm caused, and the degree to which the conduct offends principles of justice. The award must be consistent with the wrong committed and the defendant’s financial condition, and sufficient to punish the defendant and to act as an effective deterrent against the commission of such acts in the future. (See Micari v Mann, supra.) Evaluation of the harm caused, and the extent to which "the wrong complained of is morally culpable” (Garrity v Lyle Stuart, Inc., 40 NY2d 354, 358 [1976]), is guided by the policy embodied in the prohibitions against employment discrimination generally, and sexual harassment in particular.
Antidiscrimination laws are designed to eliminate the misguided notion that fundamental rights and liberties of certain classes of people need not be respected. The resulting harm to society inheres in the potential creation or perpetuation of a subclass, thus branded inferior and denied the means to participate equally in the social order. (See, Executive Law § 290; Plyler v Doe, 457 US 202 [1982].)
The HRL is rooted in our philosophical tradition of individual liberty and the right of self-determination. Prohibitions against discrimination are designed to promote these concepts by encouraging respect for human dignity. Prohibitions against employment discrimination reflect a legislative recognition that these principles are threatened by an unequal *162 allocation of power between employer and employee.[3] The misuse of that power by an employer laboring under the atavistic belief that certain groups may be relegated to a subordinate status perpetuates discrimination and reenforces barriers to opportunity.
The coercive use of power by an employer to exact sexual compliance from an employee severely undermines the Human Rights Law guarantee of equal treatment. (Cf., Skinner v Oklahoma, 316 US 535 [1942]; Loving v Virginia, 388 US 1 [1967].) Defendants’ subjugation of plaintiff through the use of sexual coercion forced her to safeguard her employment by sacrificing her body. In so doing, she surrendered one of the most private and intimate aspects of her personal liberty. (See, People v Onofre, 51 NY2d 476 [1980], cert denied 451 US 987 [1981].) Unquestionably, " '[s]exual harassment in the workplace is among the most offensive and demeaning torments an employee can undergo’ ”. (Matter of Crookston v Brown, 140 AD2d, supra, at 869, quoting Petties v New York State Dept. of Mental Retardation & Developmental Disabilities, 93 AD2d 960, 961 [3d Dept 1983]; cf., People v Liberta, 64 NY2d 152 [1984], cert denied 471 US 1020 [1985].) Unless eliminated, such conduct permits the employment structure to be permeated by attitudes and relationships which we have determined to be abhorrent. When female employees such as plaintiff are allowed to be confronted by sexual coercion on the job, women as a group are relegated to a subordinate status.
For these reasons, Guccione’s request for sexual compliance, by itself, constitutes an act of sexual harassment,[4] without regard to plaintiff’s response. Defendants’ attempt at sexual *163 extortion entailed precisely the type of insult and indignity that the statute is designed to eradicate. (See, n 2, supra.) Forcing plaintiff, because she is female, to choose between her right to liberty (bodily and personal integrity) and property (the right to earn a living) is per se discriminatory. As employers who abused their dominant status by forcing a female employee to chose between compromising either her job or her personal dignity, defendants are guilty of attempting to reduce plaintiff, because of her sex, into a position of servitude.
In this case, defendants’ attempt at sexual extortion or coercion was successful. (See also, Meritor Sav. Bank v Vinson, 477 US 57 [1986].) Defendant, by requiring plaintiff to participate, over her protestations, in sexual relationships with the salesman and the financial advisor, engaged in conduct that was reprehensible. (Cf., Micari v Mann, supra.) It was aggravated by his insistence that plaintiff maintain one of the relationships for a year and a half, under his direct supervision. Defendant’s ability to coerce plaintiff, her vulnerability to his dominating influence as her employer, and the nature of the behavior that he required, make the imposition of substantial punitive damages even more important.
The offensiveness of defendants’ conduct is not mitigated by the fact that plaintiff’s job as a model and actress for Penthouse involved, in part, the commercial exploitation of her physical appearance. Sexual slavery was not a part of her job description. The fact that plaintiff accepted employment which exploited her sexuality does not constitute a waiver of her right to be free from sexual harassment in the workplace. (Cf., State Div. of Human Rights v New York State Dept. of Correctional Servs., 61 AD2d 25, 28-29 [4th Dept 1978]; People v Liberta, 64 NY2d, supra, at 163-164.) Indeed, the purpose of the statute is to vest individuals with the power to decide for themselves whether or not to accept a particular job, even if it carries risks (see, 61 AD2d, supra, at 28), and the right to maintain that job as long as they perform the duties for which they were hired. Protections against sexual harassment are arguably more necessary in a workplace permeated by conceptions of women as sex objects. When there is a significant potential for discriminatory abuse of power by an employer, the need for an effective deterrent to enforce public policy and protect employees is even greater.
To insure that the size of a damages award is reasonable as punishment and effective as a deterrent, a final inquiry *164 must be made concerning the net worth of each defendant. (See, Rupert v Sellers, 48 AD2d 265 [4th Dept 1975].) Such an inquiry is generally improper because "the theory of our government, and a cardinal principle of our jurisprudence^ provides] that the rich and poor stand alike in courts of justice” (Laidlaw v Sage, 158 NY 73, 103 [1899]). This situation is the exception that proves and enforces that rule. The relative wealth of the defendants must be considered in fixing punitive damages, because "[i]f the purpose of punitive damages is to punish and to act as a deterrent * * * [u]nless [they are] of sufficient substance to 'smart,’ the offender in effect purchases a right to [harm] another for a price which may have little or no effect upon him. Indeed, in such a situation a defendant, instead of being deterred from repetition of his offense, may be encouraged to renew his assault.” (Reynolds v Pegler, 123 F Supp 36, 41-42 [SD NY 1954], affd 223 F2d 429 [2d Cir 1955], cert denied 350 US 846 [1955].) Failure to compute punitive damages using a relative measurement, based on the subjective financial positions of the defendants, would contravene the basic tenet that "neither the wealth of the [rich] nor the poverty of the [poor should] be permitted to affect the administration of the law” (Laidlaw v Sage, supra, at 103), for it would permit the wealthy to do wrong and evade the "pinch” that would be felt by those with fewer assets who had committed a similar offense. (See, Batavia Lodge v New York State Div. of Human Rights, 35 NY2d, supra, at 147 [damages awarded under the HRL should be reasonable "under the circumstances”]; Laurie Marie M. v Jeffrey T. M., 159 AD2d, supra, at 61 [punitive damages award excessive under the circumstances in the absence of evidence to show that defendant "is a wealthy man”].)
The parties have stipulated, for purposes of this action, that defendant Penthouse International possesses assets with a market value of $200 million, and that defendant Guccione’s net worth is $150 million. These figures supply the subjective framework within which an appropriate award must be measured.
After considering the nature of the offense and the enormous wealth of defendants, it would be inappropriate to assess punitive damages that are not significant. Only a substantial award will have the effect of punishing the defendants and vindicating the rights of the community.
Conduct of the sort committed by defendants represents the quintessential violation of our constitutionally based rela *165 tional norms of equality. Defendants used the plaintiff in furtherance of their business as if she were property owned by them. Although the plaintiff’s employment enabled the defendants indirectly to profit from her physical appearance and acting abilities, it did not render her a commodity to be leased, sold, traded or exploited because of her womanhood. Defendants’ conduct is punishable as more than simply a violation of plaintiff’s job-related property rights. It represents a flagrant abuse of power, violating plaintiffs civil rights and denigrating women as a class.
Accordingly, plaintiff is awarded $4 million in punitive damages.

. [4] The wrong committed by defendants in this case, statutorily defined as employment discrimination, also constitutes tortious conduct under the common-law theory of intentional infliction of emotional harm. (See, e.g., Micari v Mann, 126 Misc 2d 422; Ford v Revlon, Inc., 153 Ariz 38, 734 P2d 580 [Sup Ct 1987].) There is no need, however, to address that overlapping legal claim. Under circumstances such as these, where relevant common-law tort theories are subsumed within the ban on sexual harassment, a statutorily authorized judicial award of appropriate damages pursuant to Executive Law § 297 (9) will "fully redress the wrong committed.” (Koerner v State of New York, 62 NY2d 442, 449 [1984].)

. Under the common law, compensatory damages for mental distress are only available under certain circumstances, as in cases involving extreme misconduct. (See, Prosser and Keeton, Torts § 12 [5th ed 1984].) Under this standard, liability has often been imposed for insult and indignity inflicted by persons in positions of power or responsibility with respect to the public (op. cit., at 57-59); or, "[t]he extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff’s interests. The result is something like extortion.” (Op. cit., at 61.) The statute protects employees from acts of extortion motivated by prejudice, and the insult and indignity perpetrated by employers who discriminate. Compensatory damages are available for mental distress caused in every employment discrimination case, as long as the emotional harm is proved.

. "In a highly developed commercial and economic society, the use of private force is not the danger, but the uncontrolled use of coercive economic sanctions in private arrangements.” (Garrity v Lyle Stuart, Inc., 40 NY2d 354, 359.)

. The statute removes sexual advances or solicitation by an employer from the traditional rule that " 'there is no harm in asking.’ ” (Mitran v Williamson, 21 Misc 2d 106, 107 [Sup Ct, Kings County 1960], quoting 49 Harv L Rev 1033, 1055.) Between strangers, it may be true that "[m]ere words cannot amount to an assault” (Prince v Ridge, 32 Misc 666, 667 [Sup Ct, Queens County 1900]), and even if they did, not all assaults give rise to damages to compensate for any "insult and indignity” and mental suffering caused. (Supra, at 667.) Under the HRL, by contrast, if an employer uses his or her status "to induce [an employee] to grant him the favor of sexual intercourse with her,” he is guilty of sexual discrimination and is liable for compensatory damages for the mental suffering caused. (Supra, at 667.)