MARJORIE L. THORESON, Also Known as ANNEKA DILORENZO, Respondent, v PENTHOUSE INTERNATIONAL, LTD., et al., Appellants.

First Department, April 2, 1992

## APPEARANCES OF COUNSEL

*Bettina B. Plevan* of counsel *(Myron D. Rumeld* and *Jeffrey H. Daichman* with her on the brief; *Proskauer Rose Goetz & Mendelsohn* and *Greenspoon, Srager, Gaynin, Daichman & Marino,* attorneys), for appellants.

*Murray Schwartz (Steven B. Blau* with him on the brief), for respondent.

*Dorchen A. Leidholdt* and *Wendy C. Lecker* for Women's Bar Association of the State of New York and others, *amici curiae.*

*Nadine Taub* of counsel *(Rutgers Law School-Newark),* for Women's Rights Litigation Clinic and another, *amici curiae.*

*Catherine A. MacKinnon, amicus curiae.*

## OPINION OF THE COURT

RUBIN, J.

On appeal, defendants contend that the award of compensatory damages is not supported by the evidence and that punitive damages are unavailable and, in any event, excessive. The Trial Justice found that plaintiff was pressured into engaging in sexual activity with defendant Robert Guccione's

business associates, specifically an 18-month liaison with a financial advisor and a single contact with an Italian furniture manufacturer. The court further concluded that plaintiff's compliance was an implicit condition of her employment which was terminated when she refused to participate in a promotional tour in Japan because she "was afraid what he was going to ask me to do on the tour" and "who he was going to ask me to sleep with next." The court commented, "[p]laintiff's testimony concerning these matters was controverted only by defendant Guccione's blanket denial that the events took place. I do not believe him" (149 Misc 2d 150, 157).

As this court noted in *Claridge Gardens v Menotti* (160 AD2d 544, 544-545), "On a bench trial, the decision of the fact-finding court should not be disturbed upon appeal unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence, especially when the findings of fact rest in large measure on considerations relating to the credibility of witnesses" *(see also, Nightingale Rest. Corp. v Shak Food Corp.,* 155 AD2d 297, *lv denied* 76 NY2d 702). We are not prepared to say that the totality of the circumstances, as perceived by the Trial Justice from the testimony, does not permit the conclusion that plaintiff was the victim of *quid pro quo* sexual harassment *(see, Jones v Flagship Intl.,* 793 F2d 714, 719-720 [5th Cir 1986], *cert denied* 479 US 1065 [1987]; *Koster v Chase Manhattan Bank,* 687 F Supp 848, 861 [SD NY 1988]). While the dissenter's observation that plaintiff willingly embarked upon a career which exploited her sexuality is entirely accurate, it does not preclude the subsequent withdrawal of consent to exploitation, nor does it necessarily imply consent to sexual encounters of the type complained of. Even a wife, whose marital contract is deemed to imply consent to intimate physical contact, is free to withhold it *(People v Liberta,* 64 NY2d 152, 162-164).

■ Similarly, it cannot be said that the amount of the compensatory damages awarded by the Trial Justice is without foundation. Plaintiff testified that her experiences resulted in sufficient anguish to cause her to seek counselling from a psychotherapist. The Court of Appeals has emphasized that "medical treatment is not a precondition to recovery. Mental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct" *(Matter of New York City Tr. Auth. v State Div. of Human Rights,* 78 NY2d 207, 216). As held in *Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of*

*Human Rights* (35 NY2d 143, 147), "due to the strong antidis-
crimination policy spelled out by the Legislature of this State,
an aggrieved individual need not produce the quantum and
quality of evidence to prove compensatory damages he would
have had to produce under an analogous provision, and this is
particularly so where, as here, the discriminatory act is inten-
tionally committed" *(see also, Cullen v Nassau County Civ.
Serv. Commn.,* 53 NY2d 492, 497). Nor can we conclude that
the award is excessive as a matter of law *(Matter of New York
City Tr. Auth. v State Div. of Human Rights, supra).*

This case presents the issue of whether punitive damages
are available in an action brought pursuant to Executive Law
§ 297 (9). The question is essentially one of first impression.
While our decision in *Murphy v American Home Prods. Corp.*
(136 AD2d 229) has been cited as possibly endorsing such a
position *(Seitzman v Hudson Riv. Assocs.,* 143 Misc 2d 1068,
1072-1073), the issue was never reached in that case. Likewise,
certain Federal cases have suggested, with varying degrees of
conviction, that under the New York Human Rights Law
(Executive Law § 290 *et seq.),* as opposed to title VII of the
Civil Rights Act of 1964 (as amended; 42 USC § 2000e *et seq.),*
a plaintiff "may be entitled to punitive damages" *(Selbst v
Touche Ross & Co.,* 587 F Supp 1015, 1017 [SD NY 1984]; *see
also, Giuntoli v Garvin Guybutler Corp.,* 726 F Supp 494 [SD
NY 1989]; *O'Brien v King World Prods.,* 669 F Supp 639 [SD
NY 1987]). *Lippa v General Motors Corp.* (760 F Supp 1062,
1066 [WD NY 1990]) went so far as to assert that the Execu-
tive Law affords "full compensatory and punitive relief, in-
cluding damages for suffering and anguish". The cases cited as
authority for this proposition, however, *Batavia Lodge No.
196, Loyal Order of Moose v New York State Div. of Human
Rights (supra,* at 145-146) and *Matter of Board of Educ. v
McCall* (108 AD2d 855), hold only that an award for mental
anguish is a *component* of compensatory damages. By contrast,
*Conan v Equitable Capital Mgt. Corp.* (774 F Supp 209 [SD NY
1991]), a diversity action for employment discrimination under
the Executive Law, dismissed the plaintiff's claim for punitive
damages, concluding that nothing in the legislative history of
the enactment contemplates such an award *(accord, Tyler v
Bethlehem Steel Corp.,* 958 F2d 1176 [2d Cir 1992]). No State
court opinion which directly addresses the issue has been brought
to this court's attention, and none has been found. *Micari v
Mann* (126 Misc 2d 422), cited by the Trial Justice in support
of the punitive damages award, is not a case which arises

under the Executive Law, and the common-law predicate for a claim of sexual harassment which it espouses has been expressly rejected *(Murphy v American Home Prods. Corp.,* 58 NY2d 293, 307).

It is clear that, in a proceeding brought before the New York State Division of Human Rights, "the agency may award only compensatory—not exemplary—damages" *(Matter of New York City Tr. Auth. v State Div. of Human Rights, supra,* at 216). However, Executive Law § 297 (9) provides: "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate", except under certain circumstances not relevant to this matter. At issue is whether the Legislature, by employing this language, intended punitive damages to be awarded in an action brought before a court.

The liability created by the Executive Law is unknown at common law. As the Court of Appeals observed in *Murphy v American Home Prods. Corp. (supra,* at 307): "In enacting subdivision 9 of section 297, the Legislature created a new cause of action not previously cognizable, but, in doing so, provided no specific period of limitations for such action. Consequently the institution of civil actions to recover damages for unlawful discriminatory practices under subdivision 9 is governed by the three-year period of limitations prescribed in CPLR 214 (subd 2) applicable to 'an action to recover upon a *liability,* penalty or forfeiture created or imposed by statute' " (emphasis in original).

Normally an enactment which creates an entirely new cause of action is subject to strict construction, and the courts will not extend the statute beyond its express provisions (McKinney's Cons Laws of NY, Book 1, Statutes § 301 [c]). However, the Human Rights Law declares that it "shall be construed liberally for the accomplishment of the purposes thereof" (Executive Law § 300). This statement negates the effect of the general rule of construction and renders this avenue of inquiry unavailing.

■ The controlling tenet of statutory construction is that an act shall be given the effect intended by the Legislature (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]). In determining the scope intended to be accorded to the provision for maintenance of an action "for damages and such other remedies as may be appropriate", reference to extrinsic aids to

interpretation is helpful (McKinney's Cons Laws of NY, Book 1, Statutes § 120 *et seq.*). A report of the Governor's Committee to Review New York Laws and Procedures in the Area of Human Rights, submitted March 27, 1968, part V [A], entitled "Remedies Available to Complainants", states:

"RECOMMENDATION: Aggrieved persons should have a *private cause of action for damages or equitable relief* as an alternative to a proceeding before the Division.

"The Committee recommends that any individual subjected to a discriminatory practice should have a right of action in a court of competent jurisdiction for *damages caused by such discriminatory practice or other appropriate relief, including the relief set forth in the proposed Human Rights Law.* Although we would expect most aggrieved persons to use the less formal administrative procedures of the Division or a local human rights agency, they should not be required to do so" (emphasis added).

Proposed Human Rights Law (Executive Law) § 309, entitled "Remedies", provides: "1. Any person claiming to be aggrieved by an act which is a discriminatory practice under this article shall have a right of action in any court of appropriate jurisdiction for *damages* caused by such act, other *relief set forth in this article* and such *equitable remedies* as may be appropriate" (emphasis added). The use of the language "damages caused by such act" clearly denotes compensatory damages. It is also apparent that, by the use of the term "other appropriate relief", the Committee intended to indicate other forms of relief provided in the Human Rights Law together with appropriate equitable remedies. Indeed, the remedies provided in the law, as ultimately enacted, are largely equitable, including orders to cease and desist, take affirmative action, disgorge profits and report compliance, in addition to the payment of compensatory damages (Executive Law § 297 [4] [c], amended by L 1968, ch 958).

That the Human Rights Law did not contemplate the award of punitive damages is made plain by a 1991 amendment designed to bring the act into compliance with Federal law in the area of housing discrimination. In a memorandum regarding "amendments to the Human Rights Law to comply with the federal Fair Housing Amendments Act of 1988" (42 USC § 3601 *et seq.*), the State Division of Human Rights, commenting on existing law, noted, "At present the Human Rights Law * * * d. Permits only compensatory damages to ag-

grieved persons" (1991 McKinney's Session Laws of NY, at 2030, 2031). The memorandum recommends amendments "required to achieve substantial equivalency" with Federal law including, "Adding a provision providing for punitive damages to be awarded to aggrieved persons, *only in housing discrimination cases,* not to exceed $10,000" *(id.,* at 2030; emphasis added). This provision is now incorporated in Executive Law § 297 (4) (c) (L 1991, ch 368, § 6, eff July 15, 1991). The maxim *expressio unius est exclusio alterius* governs (McKinney's Cons Laws of NY, Book 1, Statutes § 240): by including in the Human Rights Law a provision for the award of punitive damages in cases of housing discrimination only, the Legislature has indicated an intent to exclude punitive damages in all other instances.

The language of the statute and the legislative history suggest only that the Legislature intended to provide an alternative, judicial forum for the determination of claims arising under the Human Rights Law and not to afford relief which is both different in kind and greater in degree from that available in administrative proceedings before the State Division of Human Rights. Judicial expansion of the relief available to an aggrieved party who elects to proceed in court to encompass potentially large awards for punitive damages would discourage claimants from seeking resolution of their claims in an administrative forum. This is an irrational result which conflicts with the legislative intent to establish procedures which are primarily administrative *(Conan v Equitable Capital Mgt. Corp.,* 774 F Supp 209, *supra).*

Finally, we note that exemplary damages are not recoverable in comparable Federal actions *(e.g., Selbst v Touche Ross & Co.,* 587 F Supp 1015, *supra; see,* 42 USC § 2000e *et seq.)* and, as one *amicus* brief candidly concedes, cases in which such damages have been awarded "are contrary to the overwhelming weight of authority." Significantly, the Legislature has amended the Human Rights Law to afford punitive damages only when required in order to achieve "substantial equivalency" with Federal law. We conclude, therefore, that the award of punitive damages by Supreme Court in this case is contrary to statute and must be vacated.

Accordingly, the judgment of the Supreme Court, New York County (Elliott Wilk, J.), entered on or about November 8, 1990 which, after nonjury trial, *inter alia,* awarded plaintiff $60,000 in compensatory damages and $4,000,000 in punitive damages on her claim for sexual harassment brought pursu-

ant to Human Rights Law (Executive Law) § 296 (1) and § 297 (9), should be modified, on the law, to the extent of vacating the award of punitive damages and, except as so modified, affirmed, without costs. The appeal from the order of the same court, entered January 3, 1991, which denied defendants' motion to vacate the award of punitive damages (CPLR 4404 [b]) is dismissed as subsumed in the judgment (CPLR 5501 [a] [1]), without costs.

KASSAL, J. (concurring). I concur to emphasize that, irrespective of this court's determination that punitive damages are not recoverable in this matter (see, *Conan v Equitable Capital Mgt. Corp.*, 774 F Supp 209 [SD NY 1991]; *Tyler v Bethlehem Steel Corp.*, 958 F2d 1176 [2d Cir 1992]), the conduct of defendant Guccione constituted a most reprehensible form of sexual harassment.

As the trial court observed, "Sexual slavery was not a part of [plaintiff's] job description" (149 Misc 2d 150, 163), despite the fact that her employment involved the commercial exploitation of her physical appearance. Indeed, plaintiff's very occupation and background rendered her especially vulnerable to sexual exploitation. The sexual exploitation and harassment found to have occurred by the trier of fact, which took the form of coercive sexual relationships designed to further Guccione's financial interests, subjected plaintiff to levels of humiliation and degradation that no civilized society should tolerate. Our decision today is in no way intended to trivialize the claims stemming therefrom, which have been vindicated under the laws designed to protect the human rights of all.

WALLACH, J. (dissenting in part). I concur with the reasoning of the majority that punitive damages are not recoverable in an action brought pursuant to Executive Law § 297 (9), to say nothing of the unprecedented and disproportionate nature of that award (exceeding by more than 66 times the compensatory award). My own analysis of this record, however, leads me to conclude that plaintiff has failed, as a matter of law, to make out a case for any recovery under the statute, and thus the action should be dismissed in its entirety.

Sexual harassment of women in the work place is a grave evil, and courts should be vigilant to enforce legislation designed to eradicate it. The insurmountable flaw in this case, however, is that if plaintiff encountered sexual exploitation, this was precisely the goal of her endeavors from the very first day she entered the employ of the defendants. Whatever

exploitation occurred here was self-exploitation, willingly undertaken for monetary and other gain. The fact that defendants may be purveyors in an industry whose product is pornography does not build a cause of action for discrimination, where it is undisputed that plaintiff was an eager—and far from naive—recruit. And while the majority may be correct in speaking of a plaintiff's right to withdraw her consent to such exploitation, there is insufficient evidence of such a decision here. Indeed, there is overwhelming evidence to the contrary.

Plaintiff, a former Penthouse Magazine "Pet of the Year", was awarded $60,000 compensatory and $4 million punitive damages for alleged sexual discrimination under the New York Human Rights Law (Executive Law art 15). Eight other causes of action in the complaint were dismissed after trial. Defendants appeal.

Plaintiff ran away from a broken home in Minnesota at the age of 15 and made her way to Beverly Hills, California, to start a new life. In order to avoid the risk of forcible return, she assumed an alias, Connie Strodtman, under which she obtained employment. After about a year, she got a job in Santa Monica as a cocktail waitress and topless dancer, and this led to a similar job in West Hollywood. It was at about this time, according to records admitted in evidence at trial, that the 17-year-old plaintiff was arrested in Pasadena and charged with lewd conduct and indecent exposure for dancing nude in a bar. A Los Angeles County jury found her guilty and she was fined $250. A year later the conviction was reversed on appeal and the matter remanded for a new trial, but this time the case was dismissed, on the prosecutor's motion, for insufficient evidence. A former roommate, who had run off with plaintiff's address book and other personal papers, testified extensively that during this period plaintiff was also involved in prostitution. The record reveals that plaintiff amassed a record of felony convictions during this period under another alias, Priscilla Shutters, for such offenses as grand theft auto, issuance of bad checks, and illegal possession of a weapon (a tear-gas gun).

Plaintiff later entered and won some beauty contests under still another alias, Anneka Steinberg. Acting lessons and union membership led to some film commercials and small parts in three movies, one of which called for her to walk across the set partially nude.

In the spring of 1973, the 20-year-old plaintiff saw defendant Guccione in a televised interview on the Merv Griffin show, and was "hypnotized" by this man's "love and care for women". After a series of phone calls, she made an appointment for an interview at Penthouse Magazine. Plaintiff brought along her photo portfolio, and told the interviewer she was an actress. The question of becoming a "centerfold" subject came up at this first meeting. Plaintiff signed a model release (using her latest "stage name", Anneka de Lorenzo),[1] and arrangements were made for a series of seminude (topless) test shots to be taken by a new photographer at the magazine. Subsequently, Guccione personally interviewed plaintiff in a "professional" setting in Los Angeles, reviewed her portfolio and recent nude photos, asked her to undress for him briefly, and told her on the spot that she would be the Penthouse Pet of the Month for September, and would be flying to London in two weeks for the photo session. There followed a whirlwind trip across country, then a transatlantic flight, first-class, escorted by Guccione, to the magazine's London studios, where he photographed her for the centerfold pictorial feature. She admits having been enthusiastic about this project. She was also swept off her feet by Guccione, but concedes that she willingly became his sometime lover, without having been seduced by him.

Plaintiff, who already had an acting agent, signed an artist-management agreement with Penthouse, and was entered in the company's executive training program, although she soon dropped out of that course. Two years later Guccione selected plaintiff as the magazine's "Pet of the Year", which involved another pictorial feature (in which she again enthusiastically engaged), cash and luxury prizes, a national tour of VA Hospitals, an international USO tour, high publicity exposure (including network and regional TV talk and variety show appearances), acting and voice lessons, and a weekly retainer for her availability for promotional tours. (Plaintiff's claim that she did not receive all the prizes to which she was entitled was among the eight causes of action dismissed by the court after trial.)

Introduced to Gore Vidal, who had written the screenplay for the Italian film "Caligula", plaintiff was given a role in the movie, with introductory billing. She soon realized that hers was but a bit part in a screen extravaganza that featured

---

1. Since revised to "diLorenzo".

Malcolm McDowell, Peter O'Toole and John Gielgud, among others. Guccione suggested that plaintiff go to the director and ask for a larger part, and this resulted in her being written into a scene with a brief interaction with the film's title star, although still not a speaking role. Guccione, who coproduced the film, was not happy with his director who, he felt, had underutilized plaintiff and other Penthouse actresses. Fearing a box office disaster, Guccione took plaintiff and others back to Italy to film some additional footage. One of these segments was a sexually explicit scene where plaintiff was asked to perform an act of fellatio, and another was a lesbian love scene. According to plaintiff, Guccione, whom she trusted, entreated her to do these scenes in order to "save the movie", in exchange for which she would supposedly share in its financial success. She was at that time on retainer for $200 a week, and Guccione promised her that doing these scenes would cement her relationship with Penthouse and provide financial security. Guccione allegedly assured her that the scenes, which he would personally direct and edit, would be "beautiful", and that her acting career would suffer no adverse consequences.

Even though she was supposedly "upset" at having done these scenes, plaintiff went back to stay with Guccione upon her return to New York. And despite the supposedly sour experience, plaintiff allowed herself to be talked into doing a spin-off film entitled "Messalina, Messalina", the character portrayed by plaintiff in "Caligula", in which she would this time play the starring role. This motion picture was almost a month and a half in the filming in Italy, during which plaintiff was paid $600 per week. Plaintiff later returned to Rome, on defendants' payroll, to promote the film. Upon her return to the United States, plaintiff left defendants' employ for what proved to be an extended stay in Florida, from August 1977 until September 1978, during which period she lived at least part of the time with a boyfriend. Plaintiff maintains that she remained on retainer with defendants for promotional work and spoke with Guccione on the telephone weekly, but the fact is that plaintiff's only connection with defendants during this period was through her dormant talent management contract. The unrefuted employment records of Penthouse show plaintiff was not on defendants' payroll during this period. In fact, she even enlisted the aid of defendants' attorney in processing her application for unemployment benefits for this period.

According to plaintiff, she returned to New York in September 1978 to live with Guccione and pursue her thespian career, enrolling at the Lee Strasberg Theatre Institute for acting lessons (one of her rewards for being Pet of the Year three years earlier). During this period following her return, in conversations over the course of about a month, Guccione broached the proposition that plaintiff have an affair with his financial adviser from London, in order to induce the latter to move to New York City permanently. The adviser, a longtime associate of Guccione, was married with a family, and made periodic trips to New York on defendants' business, often staying for as long as two weeks. Plaintiff was reluctant to engage in such an affair, but Guccione convinced her that it was important for the future of Penthouse, and furthermore, she supposedly owed him this favor in return for all he had done to enhance her career. At this point it does not appear that plaintiff considered the movie roles Guccione had secured for her to have been detrimental to her career.

Guccione's proposition with regard to the British financial adviser was initiated in early September 1978, and plaintiff ultimately agreed. The affair began in November and blossomed for a year and a half, during which plaintiff was lavishly entertained and showered with expensive gifts and intimate notes whenever the Briton came to town. She admitted that she fell in love with him. Meanwhile, Guccione put plaintiff back on the Penthouse payroll on October 16, 1978, on a $200 a week retainer, which was raised to $300 in December. In May 1980, plaintiff, assertedly feeling guilty about the possibility of breaking up her lover's family, terminated the affair. She evidently did not need Guccione's permission to do so. In fact, simultaneous with the breakup, plaintiff's weekly retainer was raised to $400.

Shortly thereafter, during the summer of 1980, plaintiff claims Guccione asked her to "date and sleep with a furniture manufacturer" from Milan. Guccione had been trying to secure a discount in furnishing a casino he was planning for Atlantic City (a project that never came to fruition), and he allegedly beseeched plaintiff to do this for him, again reminding her that she "owed him". The Italian manufacturer is never identified in the record. Indeed, the only details as to this purported rendezvous take up but a few lines of the 383 pages of plaintiff's direct testimony at trial:

"Q. Did you, in fact, have a meeting with the furniture man?

"A. Yes, I did.

"Q. Did you have relations with him?

"A. Yes, I did.

"Q. How many times?

"A. Once."

"Caligula" premiered in February 1980 to chilly notices and bombed at the box office. Anxious to exploit an overseas market for the film, Guccione arranged for plaintiff and her partner in the lesbian love scene to do a promotional tour in Japan, where there was apparently some popular interest in the movie and its stars. Having misgivings that her film career was now being tied so closely with her sexually explicit appearance in this movie, plaintiff decided not to go, and was fired.

In 1981, plaintiff commenced this action, alleging nine causes of action ranging from breach of contract in the delivery of promised remuneration, security and career advancement, to coercion, breach of promise, fraud and unjust enrichment, quantum meruit, emotional and vocational harm and degradation, and common-law and statutory sexual harassment and discrimination. In a lengthy opinion (149 Misc 2d 150), the trial court dismissed all causes of action except for unlawful sexual harassment and discrimination under the Human Rights Law (Executive Law § 296 [1] [a]; § 297 [9]). Focusing exclusively on the two sexual liaisons supposedly "coerced" by Guccione (the 18-month affair with the British financial adviser, and the one-night stand with the unidentified Italian furniture manufacturer—neither of which, incidentally, is mentioned anywhere in the complaint), the trial court entered judgment for plaintiff in the sum of $4,060,000. Defendants alone have appealed.

It need hardly be emphasized that this case is all about sexuality. Whether it is about sexual discrimination is entirely another matter. Those terms are not synonymous. The gravamen of plaintiff's case before the trial court was that defendants breached their obligations under her talent management contract in failing to develop her career as a serious actress. This and all but one of her many other claims have been dismissed, and she does not cross-appeal from that determination. In this court she stands or falls entirely on her claim arising under the State statute interdicting employment discrimination, of which sexual harassment is a recognized category.

The trial court's ruling, together with plaintiff's failure to cross-appeal the dismissal of 8 of the 9 causes of action, has simplified our task on appellate review. The only surviving avenue for recovery is the statutory remedy under the Human Rights Law, and the only basis for such recovery has been considerably narrowed by the Trial Judge to the two sexual encounters plaintiff engaged in with third parties, allegedly at Guccione's behest. Gone from the case are plaintiff's allegations of breach of contract, breach of promise, misrepresentation, fraud, unconscionability, breach of fiduciary duty, quantum meruit, and physical and emotional harm. The trial court even dismissed the notion of recovery under a theory of common-law violation of human rights. What remains is a cause of action under the Human Rights Law that alleges that as a "condition of plaintiff's employment," she was required to "perform sexual favors for Guccione and for other employees and customers of Penthouse", including "aberrational sexual practices", all resulting from Guccione's "Svengali-like" hold over her. The denouement of plaintiff's relationship with defendants, according to the complaint, was her firing because of her "refusal to continue to perform such sexual favors during a scheduled trip to Tokyo with Guccione for the promotion of the movie 'Caligula'."

The statute (Executive Law § 296 [1] [a]) defines as unlawful discriminatory practice an employer's refusal to hire or employ, his decision to bar or discharge from employment, his offer or denial of compensation or privilege in connection with employment, or his imposition of terms or conditions of employment, on the basis of sex. Admittedly, this plaintiff was *hired* on the basis of her sexuality; she was fired seven years later for her refusal to undertake an assigned promotional tour overseas, a legitimate condition of her management contract. The record is devoid of any of the crucially necessary evidence that her relationship with defendants was ever conditioned on *discriminatory* practices.

There is no evidence in the record before this court that plaintiff ever complained of her personal sexual relationship with Guccione; she admittedly loved him and willingly shared his bed. Nor is there a shred of evidence that she was expected to perform any "sexual favors" for anyone during the promotional tour to Japan. Nor is there any indication that she was ever asked to "perform sexual favors * * * for other employees and customers of Penthouse." The only evidence pointed to by the fact finder consisted of the two sexual

liaisons with third parties at Guccione's request. In the first, plaintiff allegedly was to seduce the financial adviser into an adulterous relationship—hardly an "aberrational sexual practice", in light of her experience since the age of 16. Guccione's initial entreaty took place before plaintiff had even returned to the payroll from her year in Florida, so there is no evidence of coercion in the employment sphere; and plaintiff's compensation actually went up 33% after she broke off the 18-month affair, so she was certainly not penalized for exercising her independence in terminating this relationship. The record is so devoid of details with regard to the second (one-night stand) affair that we may confidently conclude that little or no part of the large damage award rests upon that encounter. All we are left with is plaintiff's testimony that Guccione cajoled her with the assertion that she "owed him these favors." That is the sum and substance of his alleged "Svengali-like" hold over her, over the course of seven years.

The parties are in agreement that inasmuch as the Human Rights Law is so closely associated with title VII of the Civil Rights Act of 1964 (42 US Code, ch 21, § 2000e *et seq.,* and particularly § 2000e-2), cases construing that Federal statute are controlling in interpreting discrimination under our State law. Clearly discernible in the prevailing case law are two varieties of actionable sexual harassment, each of which was urged by plaintiff, both at trial and on this appeal. The first is the *"quid pro quo",* where continued employment and benefits are conditioned on the giving of sexual favors—stated simply, "sexual blackmail" *(Carrero v New York City Hous. Auth.,* 890 F2d 569, 579). The second is the offensive or "hostile environment", where the victim is subjected to demeaning acts or intimidation, such as in the form of insults and practical jokes, impinging on her character or ability to perform on the job *(Bundy v Jackson,* 641 F2d 934). But in this class of case the sexual harassment must be so severe or pervasive as to alter the conditions of the victim's employment and to create an abusive working environment *(Meritor Sav. Bank v Vinson,* 477 US 57, 67).

In order to determine whether the alleged sexual harassment at the work place is sufficiently severe and persistent as to affect seriously the well-being of the employee, the court must examine "the totality of the circumstances" *(Henson v City of Dundee,* 682 F2d 897, 904). This takes in a variety of subjective and objective factors, not the least of which is the background and experience of the employee, which would

impact directly upon her reasonable expectations when entering the work environment *(Rabidue v Osceola Ref. Co.,* 805 F2d 611, 620, *cert denied* 481 US 1041). Also important is consideration of that work environment prior to plaintiff's arrival *(supra).*

As to the environmental aspect, plaintiff is unconvincing with the suggestion that she was unaware of defendants' notoriety as a leading publisher in the sex industry in America. There is certainly no indication that the already sex-oriented atmosphere in this work environment suddenly became more pervasive after plaintiff appeared on the scene.

With regard to this employee's background and experience in sex-oriented activities, the evidence shows that plaintiff spent her formative working years in a sexually candid atmosphere. Before meeting defendants, she was no stranger to topless bars and to the silver screen, even in roles calling for her appearance in a state of undress. This is not to say that a worldly woman should be entitled to any less protection under the statute than one raised in sheltered circumstances. But background and character, as the *Rabidue* court noted, are relevant, if not crucial, particularly where, as here, compensatory damages, based solely on emotional harm, are the basis of recovery.

Even though tangible job detriment need not be shown explicitly in order to establish a claim for sexual harassment in the work place, "the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment" *(Jones v Flagship Intl.,* 793 F2d 714, 720, *cert denied* 479 US 1065). Aside from a dearth of evidence of any such harassment, plaintiff has presented no evidence of special damages linked to this alleged wrong. Indeed, the only real damages she alleges are in harm to her acting career; but by no stretch of the imagination could there be any inference of linkage drawn, from this record, between plaintiff's affairs with Guccione's financial adviser and the Italian furniture manufacturer, and plaintiff's prospects for a career in the theatre.

The trial court focused heavily, although not exclusively, on the *quid pro quo* aspect of the claim. But as indicated above, no reasonable inferences drawn from this set of facts could

lead to a conclusion of sexual harassment or discrimination. The court's findings to the contrary are defeated by plaintiff's own testimony. One of the necessary elements of any claim of sexual harassment is the "unwelcomeness" of the sexual advances (see, Meritor Sav. Bank v Vinson, supra, 477 US, at 68). The key language of the surviving cause of action of the complaint alleges insistence on performance of sexual favors "for Guccione and for other employees and customers of Penthouse". But plaintiff admitted, in her testimony, that her on-again-off-again affair with Guccione was anything but unwelcome; she admitted falling in love with him, and willingly renewing her sleeping arrangements under his roof upon her returns from Italy and Florida.

There is absolutely no evidence that plaintiff was asked to perform sexual favors for "other employees and customers of Penthouse". Even if the language of the complaint could be stretched to include the British financial adviser and the Italian furniture manufacturer, this record is again seriously lacking in necessary evidence. While it is true that plaintiff testified she was initially reluctant to engage in either of these affairs, the only pressure brought to bear upon her to engage in such conduct was Guccione's alleged statements that she "owed" him these favors. Plaintiff's description of the British affair gives the distinct impression that she was completely on her own, that she fell in love with the man and basked in the attention he devoted to her, and that she was free to break off the affair at any time, without Guccione's prior approval, as she did after 18 months. Her happiness in that affair, as evidenced by her words and pictures in the record, belies any notion of unwelcomeness. The Italian rendezvous, on the other hand, is too lacking in detail and substance to command any credibility.

Clearly, plaintiff's motivation in commencing this lawsuit was to recover for what she perceived to be a breach of her management contract. It was primarily on this cause that issue was joined and the case was tried, with expert witnesses presented by both sides.[2] Plaintiff claimed she was led to believe that her relationship with defendants would lead to

---

2. Plaintiff offered a former talent agent at the William Morris Agency, and testimony from film producer Franco Rossellini. Defendants countered with personnel from their publicity and promotional departments, as well as an attorney qualified as an expert in the field of entertainment law.

fame and fortune in a theatrical career.[3] That career path took some turns which did not end up to plaintiff's liking, and she was ultimately fired for a legitimate reason. Thus the unliquidated $60,000 award of compensatory damages for emotional harm, unaccompanied by any allegations or proof of special damages, has no foundation in this record (cf., *Matter of New York City Tr. Auth. v State Div. of Human Rights,* 78 NY2d 207).

In sum, plaintiff actively sought out and pursued a career with a company known to be a veritable beacon of the sex industry. For seven years she rode the roller coaster of pleasure, fame and recognition. If ultimate fortune eluded her, that disappointment and frustration was nonetheless not actionable, as evidenced by the trial court's dismissal of the quantum meruit and breach of contract causes of action. That her acting career did not turn out the way she expected cannot be blamed on unsupported allegations of sexual discrimination, notwithstanding the character and actions of the defendants.

Since plaintiff has failed to establish her case upon any view of the credible evidence, even when every favorable inference is afforded to the proofs submitted, her award of both compensatory and punitive damages should be vacated and the complaint dismissed.

KASSAL, J., concurs with RUBIN, J., and in a separate opinion; ROSENBERGER, J. P., concurs in the opinions of RUBIN and KASSAL, JJ; WALLACH, J., dissents in part in a separate opinion.

Judgment of the Supreme Court, New York County, entered on or about November 8, 1990 which, after nonjury trial, *inter alia,* awarded plaintiff $60,000 in compensatory damages and $4,000,000 in punitive damages on her claim for sexual harassment brought pursuant to Human Rights Law (Executive Law) § 296 (1) and § 297 (9), is modified, on the law, to the extent of vacating the award of punitive damages and, except

---

3. It should be emphasized that no part of the damage award can rest upon plaintiff's participation, voluntary or otherwise, in sexual acts depicted in the Caligula movie. As constituents of her statutory recovery, they would be barred by the three-year Statute of Limitations (CPLR 214). Presumably, evidence thereof was received as part of an attempt to prove defendants' continuing breach of the talent management contract. That claim, as we have seen, has not survived.

as so modified, affirmed, without costs. The appeal from the order of the same court, entered January 3, 1991, which denied defendants' motion to vacate the award of punitive damages (CPLR 4404 [b]) is dismissed as subsumed in the judgment (CPLR 5501 [a] [1]), without costs.