44

[642 NYS2d 739]

In the Matter of FATHER BELLE COMMUNITY CENTER et al.,
Respondents, v NEW YORK STATE DIVISION OF HUMAN
RIGHTS, on Complaint of DEBORAH A. KING and Others,
Petitioner.

Fourth Department, April 19, 1996

### APPEARANCES OF COUNSEL

*David J. Seeger,* Buffalo, for petitioners.

*Deborah A. King,* Cheektowaga, respondent *pro se.*

*Elizabeth Hurd,* Buffalo, respondent *pro se.*

*Deborah Horvatits,* Elma, respondent *pro se.*

*Lawrence Kunin,* New York City *(Michael Swirsky* of counsel), for State Division of Human Rights, respondent.

### OPINION OF THE COURT

DENMAN, P. J.

In this proceeding we are asked to consider, among other issues, whether New York's rule against imposing vicarious liability in discrimination cases precludes imposition of liability on a corporate employer for acts of sexual harassment perpetrated by its highest managerial employee. We conclude that it does not.

This proceeding arises out of five human rights complaints that culminated in a determination by the Commissioner of the New York State Division of Human Rights (SDHR) finding

the Father Belle Community Center (Center) liable for sexual harassment of the three complainants based on the conduct of the Center's Executive Director, Vito Caruso, and based on the actions of the Center's Board of Directors in its handling of the complaints and in its constructive termination or retaliatory discharge of the three complainants. SDHR awarded each of the complainants $60,000 in damages for mental anguish and humiliation, and awarded two of the complainants back pay in the amounts of $504 and $665.60, respectively.

SDHR filed a petition pursuant to Executive Law § 298 seeking an order of enforcement of its determination. SDHR's petition brings up for review the merits of the Commissioner's determination (see, Executive Law § 298; *Matter of State Div. of Human Rights v Bystricky*, 30 NY2d 322, 326), thus requiring us to decide whether the Center may be held directly liable for its Executive Director's sexual harassment of the complainants or for the Board's acts of condonation and retaliatory discharge. We must further decide whether the three awards for mental anguish and humiliation are excessive under the circumstances.

I

■ The Center is a not-for-profit corporation that provides social, educational, and recreational opportunities at its facilities in Buffalo. It receives nearly all of its funding from Federal, State, and local government, much of it through block grants administered by the City of Buffalo. The Center does not now dispute that Vito Caruso, its Executive Director, subjected the three complainants to constant sexual harassment throughout their employment. Deborah King was employed at the Center briefly in 1982 and from December 1984 until she was fired in October 1987. Elizabeth Hurd worked at the Center from July 1983 until she resigned under duress in September 1987. Deborah Horvatits worked at the Center from June 1986 until her termination in October 1987. All three women worked under the direct supervision of Caruso, the Center's highest ranking employee, who exercised considerable authority in hiring and firing and plenary authority in determining pay, assignments, and other working conditions, subject only to oversight by the Board of Directors. All three women gave testimony, much of it corroborated by one another and by other witnesses, that Caruso subjected them to a similar pattern of inappropriate and demeaning communication, unwelcome sexual overtures, unwanted physical contact,

and express and implied threats to fire them or make their jobs more difficult or unpleasant if they did not submit to his advances. Caruso repeatedly begged each of the complainants to be his "girlfriend" or "mistress", and to marry or "sleep" with him. Caruso consistently demanded that the women attend nonwork-related lunches and go on boat rides with him during business hours. On such occasions, Caruso typically would become intoxicated and would become more persistent in his romantic pursuits, frequently hugging and kissing the women and making sexually suggestive remarks. If the complainants refused his invitations to have lunch or to go on his boat, Caruso would become angry, refuse to approve their work, and threaten to fire or demote them. On several occasions, Caruso asked a complainant to share a hotel room with him on a business trip.

Each of the complainants periodically received verbal and written notices of termination, and complainant Horvatits' pay and benefits were cut. The firings typically were rescinded by Caruso when the complainants acted contrite and promised to "cooperate" with him. Additionally, Caruso left each of the complainants suggestive or threatening notes, including, on one occasion, a copy of Caruso's pistol permit reproduced under the heading, "You Asked For It." With respect to complainant Hurd, Caruso threatened to "kill" her if she were lying when she denied reporting the harassment. That threat prompted Hurd to resign her position the next day, September 8, 1987. At about the same time, Caruso's conduct became so intolerable to King and Horvatits that they complained to City officials and the Board of Directors. Complainants first disclosed the harassment to Mary Rizzo, a Board member, but initially refrained from taking the matter before the entire Board because it was composed mainly of Caruso's cronies.

Nonetheless, members of the Board of Directors became aware of the allegations of sexual harassment no later than September 14, 1987. The personnel committee of the Board met with the complainants between September 14 and 18 and, between then and late October 1987, the personnel committee and the full Board convened several times to discuss the matter. Several of those meetings included Caruso and City officials who oversaw funding of the Center. The initial response of Caruso to the allegations was to assert that he had done nothing wrong because his treatment of the complainants was no different from his treatment of the rest of the staff. On September 15, in the interim, complainant Horvatits received

a termination notice. She contacted a City official, who interceded with the Board, which restored Horvatits to her job. Thereafter, King and Horvatits were harassed and intimidated by other employees of the Center, including relatives of Caruso. Eventually, retaliatory complaints of poor performance and insubordination were filed against King and Horvatits.

On October 2, 1987, the Board took up the complaints, but soon terminated its investigation and opted to refer the matter to an arbitrator. The Board placed Caruso on paid leave of absence, but allowed him to report daily for work at the Center. Over the next several weeks, King and Horvatits continued to be harassed and intimidated by other employees. Moreover, they were repeatedly asked to resign. On October 13, 1987, King and Horvatits filed complaints with SDHR, and Hurd filed her complaint one week later. The next day, complainants attended a meeting at the Center at which they were advised that Caruso would be reinstated to his position. The Chairman of the Board asked King and Horvatits why they did not take a leave of absence or quit if they could not get along with Caruso, and informed them that, if it were up to him, they would be fired. On October 23, 1987, King received a letter threatening immediate termination, and Horvatits received a similar letter on October 26. On October 28, through intervention of City officials, King was transferred from the Center's payroll to the City's payroll, but was still employed at the Center. King was terminated by the Board on October 30, 1987 for insubordination and poor performance. That same day, Horvatits was informed by the Board that she was being terminated in an ouster of all City-affiliated workers. Like King, Horvatits was told that she had an hour to leave the premises. Many of the City-affiliated workers were later rehired by the Center, but Horvatits was not among those rehired. King and Horvatits each filed a second complaint alleging retaliatory discharge.

The complaints against the Center and Board were the subject of SDHR hearings that culminated in an order of the Commissioner dated March 12, 1993. The Commissioner found that Caruso had created a hostile work environment and that his conduct constituted *quid pro quo* harassment both on and off the work premises under circumstances in which Caruso was exercising his authority as chief executive officer for the Center, including his authority to supervise, direct, and oversee the employees and to make decisions with respect to hiring, firing, and conditions of employment. Further, the Commissioner found that the Center was responsible for the actions

of Caruso because they had been undertaken within the scope of his authority.

Additionally, the Commissioner found the Center responsible for condonation and retaliation based on the actions or omissions of the Board and supervisory employees in failing to establish policies concerning sexual harassment or mechanisms to pursue sexual harassment grievances in confidence; failing vigorously to investigate the complaints; pressuring the complainants to resign or take leaves of absence; threatening the complainants with termination; failing to protect the complainants from acts of harassment by other employees; failing to reinstate Hurd following her constructive discharge; and ultimately terminating King and Horvatits.

Based on the testimony of the complainants concerning their feelings of stress, powerlessness, fear, anger, nervousness, humiliation, and lack of self worth, together with their testimony concerning the adverse physical effects of such mental distress, the Commissioner awarded $60,000 to each complainant for emotional distress and humiliation. Further, the Commissioner made minimal awards of back pay to Hurd and Horvatits. Thereafter, SDHR filed a petition seeking enforcement of the Commissioner's order.

## II

The Center contends that it cannot be held liable for acts of sexual harassment committed by its Executive Director without the concurrent knowledge of the Board of Directors because New York law bars imposition of vicarious liability for discrimination. In our view, the Commissioner's order, which does not mention "vicarious liability" or "respondeat superior", permissibly imposes direct liability upon the Center for acts of harassment committed by its chief executive officer.

The Human Rights Law (Executive Law § 290 *et seq.*) declares that it "shall be an unlawful discriminatory practice * * * [f]or an employer * * * because of the * * * sex * * * of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment" (Executive Law § 296 [1] [a]). Through developments in case law, the concept of sex-based discrimination in employment has come to include sexual harassment of employees (*see, Matter of Salvatore v New York State Div. of Human Rights*, 118 AD2d 715; *Rudow v New York City Commn. on Human Rights*, 123 Misc 2d 709,

714-720, *affd* 109 AD2d 1111, *lv denied* 66 NY2d 605; *see generally, Harris v Forklift Sys.*, 510 US 17, 22-23; *Meritor Sav. Bank v Vinson*, 477 US 57, 64-65; *Karibian v Columbia Univ.*, 14 F3d 773, 777, *cert denied* — US —, 114 S Ct 2693). "[W]hen a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex" (*Meritor Sav. Bank v Vinson, supra*, at 64). A complainant seeking relief for sexual harassment may proceed under two theories: (1) *quid pro quo*; and (2) hostile work environment (*see, Meritor Sav. Bank v Vinson, supra*, at 64-65; *Rudow v New York City Commn. on Human Rights, supra*, at 715-718).

*Quid pro quo* harassment occurs when unwelcome sexual conduct—whether sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature—is used, either explicitly or implicitly, as the basis for employment decisions affecting compensation, terms, conditions, or privileges of the complainant's employment (*Thoreson v Penthouse Intl.*, 149 Misc 2d 150, 156, *mod on other grounds* 179 AD2d 29, *affd* 80 NY2d 490, *rearg denied* 81 NY2d 835). The issue in a *quid pro quo* case is whether the supervisor has expressly or tacitly linked tangible job benefits to the acceptance or rejection of sexual advances; a *quid pro quo* claim is made out whether the employee rejects the advances and suffers the consequences or submits to the advances in order to avoid those consequences (*see, Karibian v Columbia Univ., supra*, at 778). Because the focus is on the prohibited conduct—the unwelcome sexual overtures—and not on the victim's reaction to it, there is no requirement that the victim suffer actual economic loss (*see, Karibian v Columbia Univ., supra*, at 778; *Rudow v New York City Commn. on Human Rights, supra*, at 718-720).

Hostile work environment harassment occurs when the employer's conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment' " (*Meritor Sav. Bank v Vinson, supra*, at 65). A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' * * * that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment' " (*Harris v Forklift Sys.*, 510 US, *supra*, at 21; *see, Rudow v New York City Commn. on Human Rights, supra*, at 716-719). Unlike a *quid pro quo* claim, a hostile work environment claim may be made out in the absence of proof of linkage between the offensive conduct and decisions affecting employment. As with a *quid pro quo* claim, a hostile work

environment claim does not require proof of economic loss. Whether a workplace may be viewed as hostile or abusive—from both a reasonable person's standpoint as well as from the victim's subjective perspective—can be determined only by considering the totality of the circumstances *(Harris v Forklift Sys.,* 510 US, *supra,* at 22; *Tomka v Seiler Corp.,* 66 F3d 1295, 1305)*. Generally, isolated remarks or occasional episodes of harassment will not support a finding of a hostile or abusive work environment; in order to be actionable, the offensive conduct must be pervasive *(Harris v Forklift Sys.,* 510 US, *supra,* at 21; *Meritor Sav. Bank v Vinson, supra,* at 67; *Tomka v Seiler Corp., supra,* at 1305, n 5).

Here, the complaints were properly sustained by SDHR on overlapping theories of *quid pro quo* and hostile work environment harassment. Caruso subjected the complainants to constant unwanted sexual overtures of a verbal and physical nature. He expressly and impliedly promised the complainants various job benefits if they would agree to submit to his advances, and both threatened and inflicted economic injury if they refused. Moreover, that conduct on Caruso's part required the complainants to run a gauntlet of degrading, offensive, intimidating, and ultimately physically threatening conduct that created a hostile work environment and unreasonably interfered with the performance of their jobs.

The issue, however, is not Caruso's liability, but the Center's. Both State and Federal cases require, as a predicate to imposing liability upon the employer, that there be some basis for imputing the employee's conduct to the employer; neither imposes liability on the employer based solely on the employment relationship *(compare, Matter of State Div. of Human Rights v St. Elizabeth's Hosp.,* 66 NY2d 684, 687, and *Matter of State Univ. v State Human Rights Appeal Bd.,* 81 AD2d 688, *affd* 55 NY2d 896, *with Meritor Sav. Bank v Vinson, supra,* and *Karibian v Columbia Univ., supra,* at 779). Beyond that principle, State and Federal law differ markedly, notwithstanding pronouncements from some courts that they are virtually identical *(see, Tomka v Seiler Corp., supra,* at 1304, n 4, 1306-1307; *Song v Ives Labs.,* 957 F2d 1041, 1048; *see also, Sogg v American Airlines,* 193 AD2d 153, 155, *lv dismissed* 83 NY2d 846, *lv denied* 83 NY2d 754, *rearg denied* 83 NY2d 954 ["standards" of proof held the same under Human Rights Law and title VII of the Civil Rights Act of 1964 (42 USC § 2000e *et*

*seq.*)]). Federal courts have relied on common-law principles of agency to determine whether an employee's sexual harassment should form the basis for the imposition of vicarious liability on the employer (*see, Meritor Sav. Bank v Vinson, supra; Karibian v Columbia Univ., supra,* at 777, 779). In the Federal cases, the issue is the extent of the harasser's authority, not necessarily whether the employer knows of the harassment or condones it. That agency analysis may lead to divergent results depending on whether the claim is for *quid pro quo* harassment or hostile work environment harassment. In the former case, because the harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer (*see, Meritor Sav. Bank v Vinson, supra,* at 70-71; *Karibian v Columbia Univ., supra,* at 777; *Carrero v New York City Hous. Auth.,* 890 F2d 569, 579 ["(T)he harassing employee acts as and for the company, holding out the employer's benefits as an inducement to the employee for sexual favors"]; *Steele v Offshore Shipbuilding,* 867 F2d 1311, 1316, *reh denied sub nom. McCullough v Offshore Shipbuilding,* 874 F2d 821 ["When a supervisor requires sexual favors as *quid pro quo* for job benefits, the supervisor, by definition, acts as the company"]).

In contrast, employer liability under a hostile work environment harassment theory involves a more intricate analysis under Federal law. Whereas liability for *quid pro quo* harassment is always imputed to the employer, employers are not automatically liable for a hostile work environment created by their employees (*Meritor Sav. Bank v Vinson, supra,* at 70-72; *Tomka v Seiler Corp, supra,* at 1305; *Karibian v Columbia Univ., supra,* at 779). The liability of the employer may hinge on whether the harasser is the complainant's supervisor or merely a co-worker. If the harasser is a supervisor, the employer will be liable where the supervisor used his actual or apparent authority to engage in the harassment or where the supervisor otherwise was aided in creating a hostile work environment by the agency relationship (*see, Tomka v Seiler Corp., supra,* at 1305; *Karibian v Columbia Univ., supra,* at 780). The complainant need only establish a nexus between the harasser's supervisory authority and the acts of harassment (*see, Tomka v Seiler Corp., supra,* at 1306-1307). In contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or where a co-worker who lacks supervisory authority is the harasser, an employer

generally will not be liable unless the employer either provided no reasonable avenue of complaint or, after learning of the harassment, did nothing about it (*see, Tomka v Seiler Corp., supra*, at 1305; *Karibian v Columbia Univ., supra*, at 780). Under that analysis, there is a continuum of supervisory authority: " '[a]t some point * * * the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the [employer]' " (*Karibian v Columbia Univ., supra*, at 780, quoting *Kotcher v Rosa & Sullivan Appliance Ctr.*, 957 F2d 59, 64).

In New York, the relevant analysis is not based on common-law rules of agency and, indeed, almost wholly disregards those rules. Thus, the doctrine of respondeat superior, or vicarious liability based on the agency relationship, is not available in cases involving discrimination, including sex-based discrimination and its sexual harassment component (*see, Spoon v American Agriculturalist*, 120 AD2d 857, 858; *Matter of New York State Dept. of Correctional Servs. v McCall*, 109 AD2d 953, 954; *Hart v Sullivan*, 84 AD2d 865, 866, *affd* 55 NY2d 1011; *Matter of State Univ. v State Human Rights Appeal Bd., supra*, at 689; *Kersul v Skulls Angels*, 130 Misc 2d 345, 348; *see generally, Matter of State Div. of Human Rights v St. Elizabeth's Hosp., supra*, at 687; *Matter of Totem Taxi v New York State Human Rights Appeal Bd.*, 65 NY2d 300, 305, *rearg denied* 65 NY2d 1054). Under New York law, in order to recover against an employer, the complainant must demonstrate that the employer acquiesced in the discriminatory conduct or subsequently condoned it (*see, Matter of State Div. of Human Rights v St. Elizabeth's Hosp., supra*, at 687; *Matter of Totem Taxi v New York State Human Rights Appeal Bd., supra*, at 305; *Goering v NYNEX Information Resources Co.*, 209 AD2d 834; *Spoon v American Agriculturalist, supra*, at 858; *Hart v Sullivan, supra*, at 866). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense. An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation" (*Matter of State Div. of Human Rights v St. Elizabeth's Hosp., supra*, at 687; *see also, Goering v NYNEX Information Resources Co., supra; Matter of New York State Dept. of Correctional Servs. v McCall, supra*, at 954). Condonation may be disproved by a showing that the employer reasonably investigated a complaint of discriminatory conduct

and took corrective action (*see, Matter of State Div. of Human Rights v St. Elizabeth's Hosp., supra,* at 687; *Matter of State Univ. v State Human Rights Appeal Bd., supra,* at 689; *Matter of New York State Dept. of Correctional Servs. v McCall, supra,* at 954).

## III

We must decide whether New York's rule against vicarious liability in discrimination cases bars recovery against an employer where, as here, the harasser is its highest ranking employee. In our view, it does not. We take care to point out that we are not relying on the vicarious liability rule employed in the Federal cases; rather, we hold that the corporate employer may be held directly liable for acts of discrimination perpetrated by a high-level managerial employee. In reaching our determination, we have considered the purposes of the acquiescence or condonation requirement and the manner in which notice of the harassment would be given to the corporate employer in the usual case. Under New York law, where the complainant is harassed by a low-level supervisor or a coemployee, the complainant is required to establish only that upper-level supervisors had knowledge of the conduct and ignored it; if so, the harassment will be imputed to the corporate employer and will result in imposition of direct liability. However, there is no opportunity to make a complaint to upper-level management where the harasser is the highest ranking supervisor. Moreover, requiring the complainant in that instance to notify the corporate directors is unfair and impractical. Corporate directors typically are not present at the workplace and necessarily delegate their responsibilities to upper-level managerial employees. Thus, it would be unrealistic to require the complainant to "go over the head" of an abusive chief executive. Further, if an upper-level supervisor's knowledge of harassing conduct can be imputed to the corporate employer for the purpose of establishing acquiescence or condonation as a basis for imposing direct liability (*see, e.g., Goering v NYNEX Information Resources Co., supra,* at 834-835; *Spoon v American Agriculturalist, supra,* at 859; *cf., O'Reilly v Executone of Albany,* 121 AD2d 772, 773), there is no logical reason why the harassing conduct of a top manager cannot be imputed to the employer as well (*cf., Kersul v Skulls Angels, supra,* at 349).

The analogy is not precise, but an instructive comparison can be made to those cases in which a court assesses punitive

damages against a corporate employer for the malicious acts of its employee. Such damages may be assessed where "management has authorized, participated in, consented to or ratified the conduct" (*Loughry v Lincoln First Bank,* 67 NY2d 369, 378). Participation by a "superior officer" in the course of his employment constitutes participation by the employer itself (*Loughry v Lincoln First Bank, supra,* at 378-380). "The term 'superior officer' obviously connotes more than an agent, or 'ordinary' officer, or employee vested with some supervisory or decision-making responsibility * * * [Rather, it] contemplate[s] a high level of general managerial authority in relation to the nature and operation of the employer's business" (*Loughry v Lincoln First Bank, supra,* at 380). The level of responsibility of the officer within the entity need only "be sufficiently high that his participation in the wrongdoing renders the employer blameworthy, and arouses the 'institutional conscience' for corrective action" (*Loughry v Lincoln First Bank, supra,* at 380-381). Here, there can be no question that Caruso, the highest ranking executive of the Center, was a "superior officer" within the meaning of *Loughry,* thus rendering the Center liable as a "participant" in the offending conduct.

Although no New York case expressly imposes direct liability on an employer for acts of harassment perpetrated by a top manager, the case of *Thoreson v Penthouse Intl.* (149 Misc 2d 150, *mod on other grounds* 179 AD2d 29, *affd* 80 NY2d 490, *rearg denied* 81 NY2d 835, *supra*) supports the determination that the Center is liable. In *Thoreson,* the complainant alleged sexual harassment against her former employer, Penthouse International, Ltd., and its Chairman and principal shareholder, Robert Guccione. The complainant prevailed against both the corporation and the individual, based on the court's finding that "defendant Guccione utilized his employment relationship with plaintiff to coerce her to participate in sexual activity" (*Thoreson v Penthouse Intl.,* 149 Misc 2d 150, 157, *supra*). It is significant that none of the three published decisions in that case mentions acquiescence, condonation, or knowledge on the part of anyone else in the corporate hierarchy besides Guccione (*see, Thoreson v Penthouse Intl.,* 149 Misc 2d 150, *mod on other grounds* 179 AD2d 29, *affd* 80 NY2d 490, *rearg denied* 81 NY2d 835, *supra*). In our view, the *Thoreson* case must be read as supporting imposition of strict liability against a corporate employer for its chief executive's discriminatory conduct (*see also, Kersul v Skulls Angels, supra,* at 349; *cf., Collins v Willcox, Inc.,* 158 Misc 2d 54, 55-56).

## IV

In any event, the Center may be held liable for acts of condonation and retaliatory discharge committed by its Board of Directors. Condonation may be established by knowledge acquired after the fact, combined with insufficient investigation and corrective action (see, *Matter of State Div. of Human Rights v St. Elizabeth's Hosp., supra,* at 687; *Matter of State Univ. v State Human Rights Appeal Bd., supra,* at 689; *Matter of New York State Dept. of Correctional Servs. v McCall, supra,* at 954). Here, although detailed complaints about Caruso's conduct were related to the Board of Directors, the Board as a whole undertook no serious investigation or meaningful action on behalf of the complainants. Instead, it took a series of actions that exacerbated complainants' injuries. The Board had failed to establish any policy concerning sexual harassment or mechanisms to allow the complainants to pursue harassment grievances in confidence. That enabled fellow employees to learn about the complaints and commit retaliatory acts of harassment and intimidation. The Board failed to protect the complainants from those acts, and indeed allowed other employees to pursue retaliatory complaints of poor performance and insubordination against the complainants. The Chairman of the Board urged the complainants to resign and informed them that, if it were up to him, they would be fired. The Board endorsed a series of termination notices served upon the complainants. Although the Board placed Caruso on leave on October 2, 1987, he was allowed to continue to report to work daily at the Center, was restored to active status on October 20, 1987, and subsequently was fully reinstated to his duties as Executive Director. Moreover, although the Board resolved on October 2, 1987 to pursue an arbitration process, it abandoned that process as soon as complaints were filed with SDHR. Ultimately, the Board terminated King and Horvatits. The Board also failed to remedy the wrong inflicted upon Hurd, whose earlier resignation the Center now concedes was a constructive termination (see, *Matter of Imperial Diner v State Human Rights Appeal Bd.,* 52 NY2d 72, 78-79; *Brown v State of New York,* 125 AD2d 750, 751, *lv dismissed* 70 NY2d 747). As a consequence of its willful inaction, the Center was properly held liable for condoning Caruso's discriminatory conduct. Similarly, the Commissioner properly held the Center liable for discharging complainants King and Horvatits in retaliation for their having filed complaints with SDHR, in violation of Executive Law § 296 (7) (see, *Gleason v Callanan Indus.,* 203 AD2d 750).

## V

■ Substantial evidence supports the award of $60,000 to each complainant for mental anguish and humiliation. It is well established that SDHR may award compensatory damages for mental anguish suffered by a complainant (*Matter of New York City Tr. Auth. v State Div. of Human Rights*, 78 NY2d 207, 216; *Matter of Horgan v New York State Div. of Human Rights*, 194 AD2d 674, 675) and that such award is not dependent upon psychiatric or other medical evidence (*Matter of New York City Tr. Auth. v State Div. of Human Rights, supra*, at 216; *Thoreson v Penthouse Intl.*, 179 AD2d 29, 31, *affd* 80 NY2d 490, *rearg denied* 81 NY2d 835, *supra*). Instead, "[m]ental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct" (*Matter of New York City Tr. Auth. v State Div. of Human Rights, supra*, at 216; *see, Gleason v Callanan Indus., supra*, at 752). Deference should be paid to the assessments of SDHR in view of the "important objectives of the Human Rights Law, the discretion vested in the agency to achieve those objectives, and its four decades of special experience in weighing the merit and value of such claims" (*Matter of New York City Tr. Auth. v State Div. of Human Rights, supra*, at 215-216). "[D]ue to the strong anti-discrimination policy spelled out by the Legislature of this State, an aggrieved individual need not produce the quantum and quality of evidence to prove compensatory damages [under the Executive Law that] he would have to produce under an analogous provision" (*Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights*, 35 NY2d 143, 147). In reviewing an award for mental anguish and humiliation, the court should "determine whether the relief was reasonably related to the wrongdoing, whether the award was supported by evidence before the Commissioner, and how it compared with other awards for similar injuries" (*Matter of New York City Tr. Auth. v State Div. of Human Rights, supra*, at 219). The court should give due consideration to the evidence concerning the "complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment" (*Matter of New York City Tr. Auth. v State Div. of Human Rights, supra*, at 218). On this record, considering the "duration, severity, consequences and physical manifestations of the mental anguish" (*Gleason v Callanan Indus., supra*, at 752), we conclude that the award of $60,000 in compensatory damages to each of the three complainants was not "without foundation" (*Thoreson v*

*Penthouse Intl., supra*, at 31). Nor are the awards excessive in comparison to analogous cases (*cf., Gleason v Callanan Indus., supra*, at 751-752 [$54,000 award for mental anguish for harassment and retaliation]; *Thoreson v Penthouse Intl., supra*, at 31 [$60,000 award for mental anguish]; *SUNY Coll. of Envtl. Science & Forestry v State Div. of Human Rights*, 144 AD2d 962, 963 [$100,000 award for mental anguish]).

Accordingly, the petition for enforcement should be granted.

LAWTON, WESLEY, BALIO and DAVIS, JJ., concur.

Petition unanimously granted, without costs.