OPINION OF THE COURT
Leonard B. Austin, J.
I. Preliminary Matters
A. The Pleadings
This action was commenced by plaintiff, National Medical Health Card Systems, Inc. (NMHC), alleging five causes of action against its former employee, defendant, Joseph Fallarino.
The trial of this matter addressed the first two causes of action which sought rescission of the employment agreement dated June 15, 2004 (Agreement) (DxG[1]) and damages for fraud. Plaintiffs remaining causes of action sounding in unjust enrichment, conversion and seeking to stay an arbitration were withdrawn prior to the commencement of the trial.
Fallarino counterclaimed seeking money damages for breach of the Agreement and wrongful termination.
B. The Trial
The trial lasted five days. During that time, the court heard testimony from seven witnesses and reviewed 14 exhibits introduced by plaintiff and 13 exhibits introduced by defendant.
C. Key Issues
As framed by the pleadings and the parties, the key issues presented were:
*306 (i) Was defendant properly terminated for cause?
(ii) Did defendant falsify his resume to gain employment with plaintiff and, if so, is that a ground for rescinding the Agreement?
(iii) Was plaintiff justified in its refusal to pay defendant the moneys due under the Agreement upon his termination?
II. Findings of Fact
Based upon the credible evidence presented at trial, the court makes the following findings of fact:
A. Fallarino’s Resume
Fallarino presented his view with regard to the purpose of a resume. To him, the resume is an introduction which gives the candidate an opportunity to get his foot in the door and allow for a one-on-one interview or, put another way a “sales marketing tool.” One wants to avoid looking like a “job-hopper” with too many employments in a relatively short period of time. Omissions can be addressed at an interview since a review of references and employments listed would disclose the accuracy of a resume’s contents, Fallarino suggested.
It is not disputed that Fallarino’s resume (Pxl) contained omissions and misstatements relating to his dates of employment, the identity of all of his employers and the nature of his relationship with those employers.
Specifically, Fallarino omitted reference to his employment with Archer Management (AMS) and Arbor Management LLC. He changed the dates of his employment with Ogden to mask the two years he was with AMS and Arbor. He also described his relationship with World Organization for Retarded Children (WORC) as being a consultant rather than being an employee.[2]
In reality, Fallarino’s employment with Ogden ended in 1993, not 1996 as reflected in his resume. He was with AMS from May 1994 to May 1995 and Arbor for less than a year.
NMHC also contends that Fallarino’s employment with Sbarro was really part of a joint venture with the Scotto Brothers. Since Scotto Brothers paid Fallarino and issued 1099s to *307 him, plaintiff argues that Fallarino misstated that employment on his resume as well.
B. The Interview Process
NMHC is a publicly traded corporation which, in 2004, was in need of a head of its human resources and employee development department. It retained the services of a recruiter, Marc Savage, to identify appropriate candidates. Savage met with Fallarino to discuss his qualifications.
Neither Savage nor anyone else in the interview process was aware of the various misstatements and omissions in Fallarino’s resume (Pxl). However, Savage claims that NMHC never asked him to check the prior employers listed on the resume. He was only asked to check references. He did so by contacting senior management at Sbarro who described Fallarino as one of the best executives the company ever had. Savage did not contact any other references based upon the recommendation he had received from Sbarro. Fallarino claims that he advised Savage that there was a two-year discrepancy in the dates of employment with Ogden.
After meeting with Savage, Fallarino then met with Gerald Angowitz, who was a member of the NMHC Board of Directors and who had served in various senior corporate capacities in the areas of compensation, benefits planning and human resources for various major corporations. Angowitz assumed that the resume was factual. The prime area of their conversation was Fallarino’s experience with Sbarro as he did not recall discussing WORC or any other employment. As a result of their meeting, Angowitz recommended against Fallarino’s employment by NMHC.
In addition to meeting with Savage and Angowitz, Fallarino claims that he met or spoke with then NMHC president James Bigl, with whom he discussed only Sbarro and WORC but not Ogden, AMS or Arbor; NMHC’s CFO, with whom he discussed WORC; and others at NMHC with whom he discussed AMS and Arbor or who just welcomed him to NMHC.
As a result of the interview process, NMHC issued a letter offering employment to Fallarino on April 28, 2004 (DxF). He commenced work as senior vice-president of human resources and employee development on May 17, 2004. At that point, his salary, which was subject to later agreement, was orally agreed to be $150,000 per annum.
No job application was ever prepared by Fallarino. Such application would be significant inasmuch as it contains a provi *308 sion that the information is provided under oath and that any false statement would be grounds for dismissal. NMHC argued that there was, in fact, an application which “disappeared” from its files although no one testified to such fact. Fallarino avers that he never completed one. No satisfactory proof establishing the existence of a job application by Fallarino was adduced.
None of the misstatements or omissions with regard to Fallarino’s resume were discovered until after his termination.
C. Fallarino’s Employment by NMHC
On June 15, 2004, the parties entered into the Agreement which outlined Fallarino’s compensation and benefits as well as the other terms of his employment (DxG). The Agreement had a two-year term and provided for annual compensation of $185,000 per annum. In addition, Fallarino was part of NMHC’s executive bonus plan, got four weeks vacation, received a $500 per month car allowance and received executive level medical, dental and life insurance.
The Agreement was negotiated by Bigl, on behalf of NMHC, as one of his last acts as its president. Fallarino’s Agreement which exceeded the initial letter agreement was apparently a sore point among NMHC executives as was Fallarino’s changing of insurance brokers which were not favorably viewed.
The Agreement also made provision for Fallarino’s leaving the employ of NMHC for reasons other than for cause. Paragraph 5.2 of the Agreement provides:
“Unjustified Termination. Except as otherwise provided in Section 5.3 below, if the Employment Period shall be terminated by the Company during the Term for any reason other than (a) for Cause, (b) as a result of the Employee’s resignation, or (c) as a result of death or Permanent Disability of the Employee (collectively, an ‘Unjustified Termination’), the Employee shall be entitled to receive (I) an amount equal to the Employee’s then current Base Salary and the benefits to be provided to the Employee, as set forth in paragraphs 4.1 and 4.4 (a) hereof, for a one (1) year period (‘Severance Period’) following the Unjustified Termination (‘Severance Pay’), as long as the Employee has not breached and does not breach the provisions of Sections 6, 7, 8, 9 or 10 of the Agreement and (ii) reimbursement of all Reimbursable Expenses incurred by the Em *309 ployee prior to the termination of the Employment Period. However, such Severance Pay shall immediately be reduced dollar for dollar by the amount of any salary or other compensation received by the Employee during the Severance Period from any other entity or Person.”
Generally, other than the renegotiation of the terms of the Agreement and the change of insurance brokers, Bigl’s replacement, James Smith, viewed Fallarino’s performance as “average, at best” although he was not satisfied with the health benefits program and the absence of an employee appraisal protocol.
D. NMHC’s Termination of Fallarino
There were two women who worked in Fallarino’s human resources department, AB and CD.[3] According to Fallarino, neither had a good work ethic.
AB had been regularly warned about lateness and received a final written warning, dated January 26, 2005 (DxJ), with regard to her need for improvement to avoid termination. Fallarino also received a letter of complaint from an NMHC executive, David Haar, about AB’s lack of professionalism which was placed in her personnel file.
No such writing with regard to CD was created by Fallarino. However, CD was sending out her resume prior to February 2005. Although never stated, it had been Fallarino’s intention to terminate her.
Significantly, a Sbarro employee known to Fallarino at the time of his employment with Sbarro, Robert Sabatino, contacted Fallarino in September 2004 seeking employment. Although there were no openings available at that time, he was introduced to AB as a possible replacement for CD. AB gave him a tour of the office. On February 18, 2005, just prior to Fallarino’s vacation, Sabatino was invited back with regard to a possible opening in human resources. Sabatino met with the CFO, CIO and NMHC general counsel, Jonathan Friedman.
On Thursday, February 24, 2005, while Fallarino was away on vacation, CD went to Smith’s office to complain that she had been sexually harassed by Fallarino. She also claimed that Fallarino made disparaging remarks about an African-American *310 employee by commenting that based on the number of her absences she would likely be fired so that she could “stay home, get on welfare and collect food stamps” (DxH). Smith called Friedman into his office to have CD repeat her allegations. Friedman then conducted an investigation.
According to Friedman, the investigation encompassed a 15-minute interview with AB and an interview of 5 to 10 minutes with CD. Each stated that Fallarino had made them feel uncomfortable with questions about sex. Friedman and Smith’s testimony suggested that these were isolated instances and not an ongoing pattern. In addition, AB complained that Fallarino had brought her in to work on a Saturday and that she had little to do. Fallarino responded that she was in on a Saturday to do the work she missed due to her absence during the week.
Neither AB nor CD was called to testify by plaintiff. Friedman never looked in the personnel files of either AB or CD in the course of his investigation. He never issued a formal report to Smith with regard to his findings. Instead, he relied solely on his own handwritten notes dated February 24, 2005 (DxH).
With regard to his investigation, Friedman, who had never conducted an investigation with regard to allegations of sexual harassment, found AB to be “confident” and not upset and CD to be “sheepish.” On the other hand, Fallarino, whom he confronted immediately on his return from vacation on the morning of February 28, 2005, was found to be “fidgeting,” “nervous,” “upset” and “stuttering.” He acknowledged that neither AB nor CD were able to give any specifics and neither had any notes about any alleged incident.
After Fallarino had a chance to collect himself, he presented information about CD’s attempts to find new employment and his warnings to AB to Friedman. Fallarino claims that Friedman responded that there was “nothing here.” There was then a meeting in Smith’s office on March 1, 2005, at which Friedman was also present. Smith testified that Fallarino was then discharged due to “allegations of sexual harassment” (emphasis added). Friedman said nothing.
The firing of a top executive on allegations alone was explained by Smith. He testified that NMHC was being acquired and the acquisition could not go forward with such allegations pending. Smith, whose prior employment encompassed investigation of similar allegations, was not involved in this investigation beyond his initial contact with CD on February 24, 2005 and Friedman’s oral report to him. Smith excused this seem *311 ingly cursory approach by asserting that there was no time or need for an outside investigation.
Upon his termination, Smith offered Fallarino an ultimatum. He could receive one half of his severance as provided in the Agreement and give a general release to NMHC or he would be fired for cause, lose his benefits, get a bad reference and receive no unemployment insurance benefits. Two weeks later, Friedman reiterated that ultimatum.
It appears that it was only after Fallarino’s termination that a more thorough investigation of his resume occurred. Friedman testified that he was unaware of the issue until after the termination. It was only then that he looked at the Sbarro 10-K filings for the years 1999 and 2000 (Px7, 8) and discovered the discrepancies in the resume. It appears that until the firing, NMHC was satisfied with Fallarino’s job history as disclosed by him and did not conduct a thorough investigation.
To date, no payments pursuant to paragraph 5.2 of the Agreement have been paid to Fallarino based on NMHC’s claim that Fallarino was terminated for cause and, even if he was not, the falsity of his resume warrants rescission of the Agreement.
III. Conclusions of Law
A. NMHC’s Claims
1. Rescission
“In order to justify the intervention of equity to rescind a contract, a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof.” (Babylon Assoc. v County of Suffolk, 101 AD2d 207, 215 [2d Dept 1984] [citation omitted].) If rescission is based upon a breach of the contract, the breach must be willful and material or, if not willful, so substantial as to defeat the purpose of the contract. (Id.; see also Clarke Contr. Co. v City of New York, 229 NY 413 [1920]; Callanan v Keeseville, Ausable Chasm & Lake Champlain R.R. Co., 199 NY 268 [1910].) The element relevant to the analysis in this case relates to fraud in the inducement.
There is no question that Fallarino falsely stated his credentials on his resume. Fallarino admits that he did so to get his foot in the door and obtain a one-on-one interview. The question is: was NMHC defrauded?
The “elements of common-law fraud are a representation of a material fact, falsity, scienter, reliance, and injury.” (Kline v *312 Taukpoint Realty Corp., 302 AD2d 433, 434 [2d Dept 2003]; see also Lama Holding Co. v Smith Barney, 88 NY2d 413 [1996]; Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403 [1958].) The reliance must be justified and reasonable. (802 F Realty Corp. v American Intl. Specialty Lines Ins. Co., 295 AD2d 398 [2d Dept 2002]; Laurel Ridge v Alfredo Nurseries, 286 AD2d 710 [2d Dept 2001]; see also 60A NY Jur 2d, Fraud and Deceit § 138.)
“Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.” (Siemens Westinghouse Power Corp. v Dick Corp., 299 F Supp 2d 242, 247 [SD NY 2004], quoting Grumman Allied Indus., Inc. v Rohr Indus., Inc., 748 F2d 729, 737 [2d Cir 1984]; see Rudolph v Turecek, 240 AD2d 935, 938 [3d Dept 1997] [“where a party has the means, by the exercise of reasonable diligence, to ascertain the truth or falsity of material representations, he or she cannot assert justifiable reliance”].)
The testimony well demonstrated that NMHC, its recruiter, its interviewers and all of those involved in the interview process failed to ascertain the truth about Fallarino’s employment history though it appears to have been readily available via 10-K filings, background checks and calls to former employers. Savage testified that NMHC had not authorized him to check prior employers. He was only authorized to check references. At best, such investigation was cursory since the only reference he contacted was at Sbarro.
Likewise, Angowitz relied solely upon his interview with Fallarino in a diner wherein he only recalled discussing Fallarino’s Sbarro experience. It would appear that there was no thorough investigation of Fallarino’s credentials prior to his hiring. The key aspect of his resume, which was honestly portrayed was his employment with Sbarro.
Proof that due diligence would have demonstrated the falsity of Fallarino’s resume is found from the fact that after his firing, NMHC determined to look more closely at it in the apparent hope of establishing a justification for claiming that Fallarino was terminated for cause and bolstering its claim that he was not entitled to the benefits otherwise afforded him under paragraph 5.2 of the Agreement.
Based upon the credible evidence presented demonstrating NMHC’s failure to exercise due diligence in the hiring of Fal *313 larino, the first cause of action to have the Agreement rescinded ab initio must be dismissed.
2. Fraud
Just as NMHC could not establish fraud to warrant rescission, it cannot do so in the broader context; its fraud cause of action. Not only has NMHC failed to establish reasonable reliance, it has failed to show that it has suffered any damages causally connected with Fallarino’s fraud, if it were established.
B. Fallarino’s Counterclaim
1. Fallarino’s Termination
NMHC ascribes two bases for Fallarino’s termination. The first related to the misstatements contained in Fallarino’s resume. As discussed here, that cannot serve as the basis for his termination for two reasons. First, NMHC had ample opportunity to conduct a full investigation and background check prior to its hiring of Fallarino. It did not. Neither Bigl, Savage, Angowitz nor Friedman looked very closely into Fallarino’s employment history.
Second, when NMHC finally did its due diligence with regard to Fallarino’s employment history, it was after he had already been terminated. Savage, Angowitz and Friedman all testified that while honesty on a resume is expected and assumed, they did not bother to gather any information beyond looking into Fallarino’s employment with Sbarro until days or weeks after the termination occurred.
While it is unfathomable for a publicly traded company to be so lax in its protocol for hiring senior management, it is clear that Fallarino’s background was never the subject of a complete and thorough background check and reasonable due diligence. This is true even though the recruiter, Savage, was entitled to 25% of Fallarino’s first year salary as his fee. Thus, the misstatements made by Fallarino, improper and unprofessional as they may be, cannot serve as an after the fact justification for his termination.
Likewise, the alleged sexual harassment of AB and CD cannot serve as the basis for Fallarino’s termination. Even were the cursory, summary analysis done by Friedman who had no experience or knowledge in this area somehow sufficient, and it was not, the uncorroborated, seemingly isolated instances which were considered in a vacuum, did not legally rise to the level of actionable sexual harassment which should have warranted the rapidity of the firing. (See Petrosino v Bell Atl., 385 F3d 210, *314 222 [2d Cir 2004] [where the court held, “(s)imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim for discriminatory harassment”]; see also Forrest v Jewish Guild for the Blind, 3 NY3d 295 [2004] [isolated incidents or episodes do not rise to the level of a hostile work environment].) The determination as to whether Fallarino created a hostile work environment for AB and CD must be viewed in the totality of the circumstances presented. (Harris v Forklift Systems, Inc., 510 US 17, 23 [1993]; Matter of Father Belle Community Ctr. v New York State Div. of Human Rights, 221 AD2d 44, 50-51 [4th Dept 1996].) The case against Fallarino in this regard has not been made to justify his termination.
The real motivation for the firing, which Smith as an experienced businessman well knew was superficial at best, related to the imminent takeover of NMHC. It could not afford to have these allegations out there at that time. It seemed to be an easy decision to oust the unpopular head of the human resources division when he was Smith’s predecessor’s hire, he was being paid more than originally offered and he was not fully successful in implementing a medical insurance program at NMHC. Despite his experience with such matters, Smith took the easy way out and validated Friedman’s “investigative” findings.
The credible evidence demonstrates that there was no basis under the contract to fire Fallarino. Having done so, Fallarino is entitled to the salary benefits he would have enjoyed under section 4 of the Agreement; to wit: salary — $185,000 (IT 4.1); and car allowance — $6,000 (1i 4.3 [c]), together with interest from the date of his termination as well as the other benefits under the Agreement to which he would be entitled including the value of major medical, dental, life insurance and disability benefits to which he would have been entitled (1Í 4.3 [a]) and bonuses paid to employees of “similar title and responsibility” (II 4.2). Such sums cannot be determined on the record before this court. Thus, a damages hearing on this issue must be held.
Fallarino, however, is not entitled to any other damages which he claims flow from his wrongful termination including stock options which were set forth in the initial letter agreement (DxF). That agreement was superceded by the Agreement under paragraph 13.9.
Finally, it must be noted that this court is distressed with the cavalier manner in which Fallarino eschewed truth and integrity for personal gain and a “foot in the door.” His explanation *315 of that is the way it is done to get an interview makes little sense and can enjoy no measure of benefit here. Fallarino is fortunate that his hiring and firing were mishandled. He should not be punished because the allegations against him were not properly investigated or handled. Nor should he be rewarded beyond that which the Agreement allows.
Counsel shall appear for a hearing on September 18, 2008 at 10:00 a.m. for the purpose of determining the value of the bonus and insurance benefits to which Fallarino would be entitled consistent herewith. Upon such determination, Fallarino shall be entitled to enter judgment for that sum together with $191,000 and interest from the date of termination, March 1, 2005, and costs and disbursements as taxed by the Clerk of the Court.

. Plaintiffs trial exhibits will be designated herein as “Px — .” Defendant’s trial exhibits will be designated as “Dx — .”

. Fallarino’s supervisor at WORC, Peter Smergut, testified that although Fallarino had two positive evaluations, his experience was not a good fit to work with a not-for-profit organization. When Fallarino left the employ of WORC, an agreement and general release dated February 11, 2004 were executed. Paragraph 12 of that agreement provided that only Smergut would give a reference for Fallarino and that he would say that Fallarino was a consultant rather than a W-2 employee (Pxl2).

. The identity of these women will not be disclosed in this decision given the sensitive nature of their involvement in the events which led to Fallarino’s termination.